*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-11-0001074
07-AUG-2014
01:55 PM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

SANDRA C.J. BALOGH, Respondent/Plaintiff-Appellant,

vs.

DONALD RAYMOND BALOGH, Petitioner/Defendant-Appellee.

SCWC-11-0001074

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0001074; FC-D NO. 10-1-0149)

AUGUST 7, 2014

RECKTENWALD, C.J., NAKAYAMA, MCKENNA, JJ., AND
CIRCUIT JUDGE CHAN, IN PLACE OF ACOBA, J., RECUSED,
WITH POLLACK, J., CONCURRING AND DISSENTING SEPARATELY

OPINION OF THE COURT BY RECKTENWALD, C.J.

We consider whether various documents signed by a husband and wife should control the division and distribution of their marital partnership property upon divorce.  Donald Raymond Balogh (Ray) and Sandra C.J. Balogh (Sandra)[1] married in New

---

[1] Because both parties in this case share the same surname, we refer to them by their first names, i.e., Ray and Sandra.

Jersey in 1981. After moving to Oahu in 2003, the couple began constructing a home on a vacant lot they had purchased (Kahalakua property or the property). The parties held title to the property as tenants by the entirety.

On October 6, 2008, following a period of tension between Ray and Sandra, they each signed a handwritten document stating that if they separated, Sandra would receive seventy-five percent of the profit from the sale of the property, the contents of their home (excluding Ray's tools and clothes), and all of their vehicles. A few weeks later, on October 24, 2008, the parties signed a typewritten Memorandum of Understanding (MOU) stating that upon separation or divorce, Sandra would receive seventy-five percent of the proceeds from the sale of the property, the contents of their home (excluding Ray's tools and building equipment), all of their vehicles, and $100,000 from Ray in lieu of alimony and court proceedings.

After a period of continued tension between Ray and Sandra, Ray agreed to move out of the couple's home on August 15, 2009. On September 1, 2009, Ray signed a quitclaim deed transferring his entire interest in the property to Sandra for ten dollars and "other valuable consideration."

In January 2010, Sandra filed a complaint for divorce in the Family Court of the First Circuit. Notwithstanding the quitclaim deed and two agreements, the family court awarded Ray and Sandra each a one-half interest in the property, which it

valued at $1.6 million at the time of divorce.[2]  The family court concluded that it would be unconscionable to enforce the quitclaim deed and that all three agreements were unenforceable because Ray acted under duress and coercion when he signed them.

Sandra appealed, and the Intermediate Court of Appeals vacated in part the family court's divorce decree and its findings of fact and conclusions of law, and remanded for further proceedings.  The ICA concluded that both the quitclaim deed and MOU were enforceable.  The ICA explained that the quitclaim deed was not unconscionable and that Ray executed both the deed and the MOU voluntarily.  The ICA also concluded that the deed superseded the MOU only to the extent it modified the disposition of the Kahalakua property, and therefore remanded to the family court to determine whether Ray owed Sandra an additional $100,000 pursuant to the MOU.

In his application, Ray presents two questions: (1) whether the ICA erred in vacating the family court's decision that the postmarital agreements and the quitclaim deed were unenforceable because they were unconscionable; and (2) whether the ICA erred in vacating the family court's decision that the postmarital agreements and quitclaim deed were unenforceable because they were entered into involuntarily.

As a threshold matter, we hold that the quitclaim deed

_____

[2]     The Honorable Paul T. Murakami presided.

does not constitute a separation agreement that alters the parties' rights to an equitable division of their marital partnership property, such that Sandra should receive the entire value of the Kahalakua property.  The ICA therefore erred in concluding that the quitclaim deed was an enforceable separation agreement.

Because the quitclaim deed did not affect the disposition of the couple's marital partnership property upon divorce, we must also consider whether the MOU is enforceable. We hold that the MOU is enforceable because it is not unconscionable and was entered into voluntarily.  Because we conclude that the MOU is enforceable, we do not consider the October 6, 2008 handwritten agreement.  The ICA's judgment is therefore vacated, the family court's divorce decree and findings of fact and conclusions of law are vacated in part, and we remand this case to the family court for further proceedings consistent with this opinion.

## I.  Background

The following factual background is taken from the record on appeal and the family court's findings of fact and conclusions of law.[3]

_____

[3]  On appeal, Sandra challenged only two of the family court's factual findings.  Specifically, Sandra challenged finding of fact 48 to the extent it stated that "Sandra told Ray he should leave," and finding of fact 53, which stated the following: "After discussions with Sandra, Ray thought the Quitclaim deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when thing[s] returned to

(continued...)

## A.    Factual background

Ray and Sandra married in 1981 in New Jersey.  At the time of the marriage, Sandra owned two properties in Monmouth County, New Jersey.  Sandra sold the first property in 1982 for $89,000.  The second property was a vacant lot which Sandra had purchased for $28,750 (Wall Township property).  At the time of the marriage, Ray owned one property which he sold shortly thereafter for $40,000.  According to Ray, after he and Sandra married, they built a home on the Wall Township property.

Ray and Sandra are both well educated.  Ray has a bachelor of science and a master's degree in electrical engineering.  Sandra has a bachelor of science in biological science and a master's degree in education and student personal services.  While living in New Jersey, Ray worked as a contractor for various companies.  Before retiring in 2002, Sandra worked as a high school guidance counselor for more than twenty-five years.

While Ray and Sandra were living in New Jersey, they regularly vacationed in Hawai'i.  In 2002, Ray and Sandra purchased the Kahalakua property, which was a vacant lot on O'ahu on Kahalakua Street, for $280,000.  Ray and Sandra took out a home-equity loan on the Wall Township property to pay for the

---

    [3](...continued)
normal."  All of the family court's remaining findings of fact are binding on this court.  See Bremer v. Weeks, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004) ("[F]indings of fact that are not challenged on appeal are binding on the appellate court." (quotation marks, ellipsis, and citation omitted)).

Kahalakua property.  Ray and Sandra held title to the Kahalakua property as tenants by the entirety.

In 2003, Ray and Sandra decided to move to Hawaiʻi so that Sandra could care for her elderly parents.  The couple sold the Wall Township property for $545,000.

Soon after arriving in Hawaiʻi, Ray and Sandra hired a contractor to build a home on the Kahalakua property for $595,000.  The couple used the proceeds from the sale of the Wall Township property, as well as approximately $350,000 Ray had inherited and money from their joint savings, to help pay for the Kahalakua property and the construction of the home on the property.

Construction on the property began in 2004 and the home was supposed to be completed within two years.  There were problems with the construction process from the start.  The builder showed up only sporadically and eventually walked off the project without completing the work.  In 2006, the builder placed a mechanic's lien on the property, even though there was a list of approximately 150 incomplete items.

The homeowner's association then sought to assess Ray and Sandra a penalty totaling $350,000 because the house had not been completed within the prescribed two-year period.  The couple sued the homeowner's association, and the parties agreed on a reduced penalty of $5,000 with an additional two-year period to complete construction of the home.

In order to complete the home, Ray and Sandra paid a total of $60,000 to six additional subcontractors, but the home was still not completed.  About six months after the original builder had walked off the job, Ray and Sandra were able to move into the house.

During this time, Sandra was working as a part-time secretary, and Ray was working for Northrop Grumman.  Sandra coordinated the work of most of the subcontractors, and Ray worked on the house when he was home from work.  For example, Ray finished the kitchen.

Tension arose between Ray and Sandra after Ray began going outside their home without clothes on.  Ray's behavior resulted in complaints from neighbors and a visit to the couple's home by the police.  Sandra also suspected that Ray was having an affair because he had lost weight, was working out, and was well tanned.  Sandra also observed Ray giving other women what she described as "lecherous looks."

Ray stopped working in July 2008, after his contract with Northrop Grumman had expired and he was unable to find additional work.  At the time of his retirement, Ray was earning between $115,000 and $120,000 per year.  Following his retirement, Ray continued to work on the house.

After months of arguing and still questioning Ray's fidelity, Sandra told Ray that if he was serious about being committed to the marriage, that they should "write something up."

On October 6, 2008, Ray wrote an agreement, as dictated by Sandra, that provided the following:

> If Sandy and Ray Balogh are to separate from each other their assets are to be divided as such:
>
> I Donald Raymond Balogh agree that my wife Sandra C. Balogh will receive:
>
> 1. ¾ or 75% of the profits of the sale of [] Kahalakua St.
>
> 2. The entire contents of the house excluding Ray's tools and clothes
>
> 3. All vehicles at time of separation[.]

Both Ray and Sandra signed the agreement. Sandra was not thinking about divorce when she asked Ray to sign this agreement; instead, Sandra thought that Ray was committing to saving their marriage. Ray acknowledged that he had agreed to the terms of the agreement, and Sandra testified that she did not threaten Ray to get him to sign the agreement. According to Ray, he was not in his right mind when he signed the agreement, but nevertheless signed the agreement to show his good faith and commitment to save the marriage. Ray thought that if he did not sign the agreement, his and Sandra's relationship would further degrade and he would be thrown out of the house.

Sandra, however, remained suspicious of Ray's fidelity. Just over two weeks after they had signed the first agreement, Ray and Sandra executed the MOU in front of a notary. The MOU provided the following:

> This Agreement between Donald Balogh and Sandra Balogh will be implemented if they are to separate and/or divorce from each other.

Their assets will be divided as follows:

1. In regards to the contents of the house at [] Kahalakua St., Honolulu, HI []: Donald Balogh (Ray) will receive his tools and building equipment. Sandra Balogh (Sandy) will receive the entire contents of the house, furniture, appliances, electronics (televisions, etc.)

2. In regards to vehicles: Sandy will receive the vehicles.

3. In regards to the proceeds of the house, due to a sale: Sandy will receive 75% of the sale proceeds and Ray will receive 25% of the proceeds.

4. In regards to compensation: Ray agrees to pay $100,000.00 to Sandy in lieu of Alimony and court proceedings.

Again, both Ray and Sandra signed the agreement. Sandra testified that the MOU was intended as an inducement for Ray to work on the marriage because if Ray was "going to sign something like that, which gives [Sandra] quite a bit, then [Ray] must [have been] serious about working on the marriage." Sandra testified that she added the additional term requiring Ray to pay her $100,000 to obtain further commitment from Ray to their marriage and to "see how serious he was." Ray acknowledged that he agreed to the terms of the MOU, and Sandra testified that she did not threaten Ray before he signed the MOU. Because Ray signed the MOU, Sandra thought that Ray would tell her the truth and stop his inappropriate behavior. Ray signed the MOU in a "desperate attempt to hold the marriage together."

In November 2008, an attorney representing the homeowner's association mailed a letter to Ray and Sandra. The letter stated that a number of individuals had complained about

Ray's behavior. In January 2009, a second letter was mailed to Ray and Sandra. This letter detailed another incident involving Ray and demanded that Ray cease and desist. Ray hid both of these letters from Sandra. Ray's behavior, however, did not stop.

In June 2009, Ray and Sandra were walking on the Makapu'u Trail when police stopped Ray to question him about exposing his buttocks. The following month, Ray and Sandra were at Ala Moana shopping center when security officers again stopped the couple to question Ray about exposing his buttocks. Ray was issued a trespass warning, banning him from the shopping center for one year. Following both incidents, Ray told Sandra that he had not exposed himself.

Ray sent a written request to Ala Moana, asking that the one-year ban be lifted, but on August 10, 2009, that request was denied. Upon receiving the letter denying Ray's request, Sandra wanted to contact a lawyer because she believed Ray that he had done nothing wrong. Ray then admitted to exposing his buttocks at Ala Moana. Sandra was shocked. Ray agreed to move out of the couple's home the following day.

Ray testified that by that point, the marriage had "melted down," the anxiety and friction were constant, and there was "just so much tension in the house," that he "decided that it'd be best that [he] leave." Before Ray left, Sandra asked him to call their relatives to tell them what was happening. While

Ray was speaking to his sister on the telephone, Sandra heard Ray mention the possibility of divorce and she got upset. Sandra then told Ray, "I need security, Ray, I need security, I need you to sign the house over to me." Ray agreed to do so, and Sandra said that she would make the necessary arrangements. Ray moved out of the couple's home on August 15, 2009.

On September 1, 2009, Ray and Sandra met to execute a quitclaim deed, in which Ray granted his interest in the Kahalakua property to Sandra in exchange for ten dollars and "other valuable consideration." According to Ray, he thought the deed was only a "temporary agreement," that would protect the home from potential lawsuits, and that title would eventually be transferred back to joint ownership. Ray testified that he signed the deed in an effort to save the marriage and that he signed the document "in a panic."

On September 24, 2009, Ray and Sandra met with Dr. Renee Robinson for marriage counseling. Dr. Robinson referred Ray to a specialist on obsessive-compulsive behavior. Ray saw the specialist three times, who recommended ways for Ray to deal with his behavior.

B.   **Family court proceedings**

Ray and Sandra attempted to execute an uncontested divorce, which failed because Ray refused to sign the divorce documents. On January 14, 2010, Sandra filed a Complaint for Divorce. Following a trial, the family court rendered an oral

-11-

decision.  As relevant here, the family court stated the following:

> The Court considered what it thought to be the appropriate motivations and reasonings of the parties. What was clear to the Court is that at the time the documents were done, both were focused –- both husband and wife were focused on I think, in their own words, saving the marriage.  That was the primary motivation for the documents.  At some point those actions -- what may have been intent became actions.  A quitclaim was signed.  But it is unclear as to what the motivations of both parties were, and that's why, again, you folks went to trial.  Based on the relevant case law, the Court finds that this would be an inequitable provision to hold both parties to.
>
> Court's going to rule as follows:
>
> With regard to the marital property, which is the Kahala home, the Court is going to basically award Mr. Balogh a one half interest.  That one half interest may be satisfied either by way of a sale of the property, in which case the net proceeds are cut in half, or Mrs. Balogh may buy out Mr. Balogh.
>
> The Court's going to set the buy-out price -- I'm sorry, the value of the property at 1.6 based on the relevant testimony.  Again, the Court comes to that number based on what was presented in court.  I know there's conflicting testimony, but that's the price the Court's going to -- or the –- the value the Court will set.  Again, if it comes to an actual sale, it may be more, it may be less.  For purposes of a buy-out, the Court will set it at 1.6.  So basically it's 800,000, if it's a buy-out.

On December 2, 2011, the family court issued the divorce decree.  The decree provided the following:

> a. The Court finds that it is inequitable to enforce the agreements entered into by the parties on October 6, 2008, October 24, 2008, and September 1, 2009, as to the real property located at [] Kahalakua Street, Honolulu, Hawaii (marital residence).
>
> b. The gross value of said property is $1,600,000.00.
>
> c. Said property shall be sold in a commercially reasonable manner.  From the proceeds of the sale, the realtor commissions, escrow fees, and costs of sale shall be paid.  Thereafter, the net proceeds shall be divided equally between the parties.
>
> d. Either party may buy-out the other party.

-12-

e. The foregoing provisions shall be enforced upon the expiration of 90 days from the effective date of this Decree.

f. The parties [are] to cooperate on resolving the mechanics lien.

On February 15, 2012, the family court issued its findings of fact and conclusions of law. As relevant here, the family court made the following conclusions of law:

K. To enforce the parties' agreement or the Quitclaim Deed is to award Sandra with a marital asset worth $1,600,000. In doing so, Sandra would be receiving more than 85% of the marital estate.

L. In addition, Ray contributed $350,000 of his inheritance and $40,000 of his premarital asset[s] to the marital partnership, for which he is not receiving a credit. Sandra contributed $89,000 of her premarital asset[s] to the marital partnership for which she is not receiving a credit.

M. If Ray received credit for his $390,000 capital contribution, Ray's share of the retirement/securities accounts would just be sufficient to repay him his capital contribution. He would in essence receive 0% of the marital estate if Sandra is awarded the Kahala Kua property.

N. After thirty years of marriage, the Court concludes it would be unconscionable to award Sandra the Kahala Kua property by enforcing the Quitclaim Deed. Kuroda v. Kuroda, 87 Haw. 419, 958 P.2d 541 (Haw. App. 1998); and Lewis v. Lewis, 69 Haw. 497, 748 P.2d 1362 (1988).

O. Further, after considering their testimony, the Court finds that the parties were motivated to save the marriage when they signed the various agreements. When Ray signed the Quitclaim Deed, Ray was protecting their marital home from potential lawsuits and had no intent of permanently transferring his interest to Sandra. Neither party intended their marriage to result in a divorce and to divide their marital estate accordingly.

P. The Court finds Ray was suffering from extreme distress as a result of the ongoing construction of their Kahala Kua residence, the contractor's walk-off and lawsuit in 2006, the penalties assessed by the [homeowner's association] and parties' lawsuit against [the homeowner's association], his high security clearance job which also required twenty-four hour/seven days on call one week a month, the continuing issues with the subcontractors, and his uncontrollable obsessive behavior that escalated from

-13-

his backyard nudity to public display, his shame and embarrassment, his fear of being discovered, and the constant argument with Sandra about his inappropriate behavior. At the same time, Sandra suspected him of infidelity which further exacerbated the marital relationship and escalated the tension and the friction in their home. Ray was thus under duress and coercion when he signed the agreements. Prell v. Silverstein, 114 Haw. 286, 162 P.3d 2 (Haw. App. 2007).

Q. Therefore, the Court concludes that the parties' agreements on October 6, 2008, October 24,2008, and September 1, 2009, are not enforceable.

R. Accordingly, each party shall be awarded fifty-percent (50%) interest in their Kahala Kua property. The parties may sell said property and divide the net sales proceeds equally or Sandra may buyout Ray's interest for the amount of Eight Hundred Thousand and No/l00 Dollars ($800,000.00). Said provision shall take place within 90 days of the effective date of the Divorce Decree.

## C.   ICA proceedings and proceedings in this court

On December 20, 2011, Sandra timely filed a notice of appeal. In her amended opening brief — and as relevant here — Sandra argued that the agreements and the quitclaim deed were not unconscionable, Ray was not under duress when he signed each agreement and the deed, and in signing the three documents, Ray did not intend to protect the Kahalakua property from the claims of third parties. Sandra argued, therefore, that the agreements and the deed were enforceable.

The ICA agreed with Sandra that the family court erred with regard to the agreements' enforceability. The ICA first concluded that the quitclaim deed was not unconscionable. The ICA noted that "nothing in the record indicates unfair surprise," and that "this is not an exceptional case where the agreement was so one-sided that it is unconscionable even without a showing of

-14-

unfair surprise."  The ICA explained that "[t]he fact that [Ray's] (perhaps shortsighted) decision to quitclaim his interest to [Sandra] ultimately turned out to be a bad one from his perspective is irrelevant and does not warrant invalidating the quitclaim deed."

The ICA further concluded that Ray "freely and voluntarily entered into the agreements."  Specifically, the ICA noted that both Ray and Sandra were well educated, and that "there is nothing in the record showing that [Sandra] used threats or any other improper methods of persuasion."  The ICA also rejected Ray's argument that he never intended to convey his interest in the Kahalakua property.  The ICA explained that Ray's statements regarding intent "were inadmissible for purposes of contradicting the deed's clear language, under which he granted his interest in the [Kahalakua property] to [Sandra] as tenant in severalty."  The ICA further explained that because the deed was unambiguous, extrinsic evidence of the facts and circumstances surrounding the execution of the deed was not "competent to contradict, defeat, modify or otherwise vary the meaning or legal effect of the deed."  (Internal quotation marks and citation omitted).  The ICA concluded, therefore, that the "Family Court erred in failing to classify the [Kahalakua property] as [Sandra's] separate property pursuant to the plain language of the deed."

In a concurring opinion, Judge Foley stated that

unconscionability encompasses two basic principles:  one-sidedness and unfair surprise, and indicated that both must be present in order for the doctrine to apply.  Specifically, Judge Foley noted that, even assuming the quitclaim deed was one-sided, "nothing in the record indicates unfair surprise."

The ICA entered its judgment on appeal on October 3, 2013, and, on December 2, 2013, Ray timely filed an application for writ of certiorari.  In his application for writ of certiorari, Ray presents two questions:

> 1.   Whether the ICA erred in vacating the Family Court's decision that postmarital agreements were unenforceable because they were unconscionable.
>
> 2.   Whether the ICA erred in vacating the Family Court's decision that postmarital agreements were unenforceable because they were involuntary.

## II.  Standards of Review

### A.   Construction of contract

"[T]he construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court."  Brown v. KFC Nat'l Mgmt. Co., 82 Hawai&#x02BB;i 226, 239, 921 P.2d 146, 159 (1996).  Unconscionability is a question of law this court reviews de novo.  See, e.g., HRS § 490:2-302(1) (2008).  "Whether particular circumstances are sufficient to constitute . . . duress is a question of law, although the existence of those circumstances is a question of fact."  Gruver v. Midas Int'l Corp., 925 F.2d 280, 282 (9th Cir. 1991) (citing

-16-

Oregon law on economic duress).

## B.    Findings of Fact and Conclusions of Law

The family court's findings of fact are reviewed under the clearly erroneous standard.  Kakinami v. Kakinami, 127 Hawaiʻi 126, 136, 276 P.3d 695, 706 (2012) (citation omitted).  A finding of fact is clearly erroneous when "(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made."  Id.  "'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  Id.

The family court's conclusions of law are reviewed de novo.  Id.

### III.  Discussion

At the outset, we must decide whether the quitclaim deed in fact constituted a separation agreement that altered the parties' rights to an equitable division of the couple's marital partnership property, such that Sandra must receive the entire value of the Kahalakua property pursuant to the deed.  For the reasons set forth below, the answer to this threshold question is no.  Accordingly, the ICA erred in concluding that the quitclaim deed was an enforceable separation agreement.

Because the quitclaim deed did not affect the disposition of the parties' property upon divorce, we must also decide whether the MOU is enforceable.  For the reasons set forth below, the MOU is enforceable because it is not unconscionable and Ray entered into the agreement voluntarily.  Because we conclude that the MOU is enforceable, we do not consider the enforceability of the October 6, 2008 handwritten agreement.

**A.  The quitclaim deed was not an agreement to alter the division of Ray and Sandra's marital partnership property**

"In Hawai‘i, there is no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth HRS § 580-47."  Kakinami, 127 Hawai‘i at 136-37, 276 P.3d at 706-06 (brackets and internal quotation marks omitted) (quoting Tougas v. Tougas, 76 Hawai‘i 19, 26, 868 P.2d 437, 444 (1994)).  Pursuant to HRS § 580-47(a), the family court has broad discretion to divide the estate of divorcing parties in a "just and equitable" manner.  HRS § 580-47(a) (Supp. 2011); see also Kakinami, 127 Hawai‘i at 137, 276 P.3d at 706.  This court has adopted the "partnership model of marriage" to guide the family court in its exercise of this discretion.  Kakinami, 127 Hawai‘i at 137, 276 P.3d at 706 (citing Gussin v. Gussin, 73 Haw. 470, 486, 836 P.2d 484, 492 (1992)).  Pursuant to the partnership model, "the family court can utilize the following five categories of net market values (NMVs) as guidance in divorce cases":

> Category 1. The [NMV], plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial.]
>
> Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.
>
> Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

Id. at 137-38, 276 P.3d at 706-07 (brackets in original).

These NMVs generally determine the division of marital partnership property upon divorce. However, spouses may expressly contract for a different division of marital partnership property, and the family court must enforce all valid and enforceable agreements with regard to marital property division.[4] See HRS § 572-22 (2006) ("All contracts made between

_____

[4] Spouses may contract regarding marital property rights in premarital, postmarital, or settlement agreements. Premarital or prenuptial agreements are entered into before marriage. See, e.g., Prell v. Silverstein, 114 Hawaiʻi 286, 287-88, 162 P.3d 2, 3-4 (App. 2007). Postmarital or postnuptial agreements are entered into after marriage. See, e.g., Chen v. Hoeflinger, 127 Hawaiʻi 346, 352, 279 P.3d 11, 17 (App. 2012). Settlement agreements are entered into after separation or in anticipation of immediate separation. See, e.g., Bienvenue v. Bienvenue, 102 Hawaiʻi 59, 61, 72 P.3d 531, 533 (App. 2003).

spouses . . . not otherwise invalid because of any other law, shall be valid."); Epp v. Epp, 80 Hawai'i 79, 87, 905 P.2d 54, 62 (App. 1995).  In addition, spouses may exclude certain assets from the marital partnership entirely, thereby segregating those assets as marital separate property.  Marital separate property includes:

> a.  All property that was excluded from the marital partnership by an agreement in conformity with the Hawai'i Uniform Premarital Agreement Act (HUPAA), HRS chapter 572D (Supp. 1992);
>
> b. All property that was excluded from the marital partnership by a valid contract; and
>
> c. All property that (1) was acquired by the spouse-owner during the marriage by gift or inheritance, (2) was expressly classified by the donee/heir-spouse-owner as his or her separate property, and (3) after acquisition, was maintained by itself and/or sources other than one or both of the spouses and funded by sources other than marital partnership income or property.

Kakinami, 127 Hawai'i at 138-39, 276 P.3d at 707-08 (brackets and ellipsis omitted) (emphasis added).

In the instant case, the quitclaim deed does not constitute either an express agreement to deviate from the partnership model of marital property division, or a valid contract converting the Kahalakua property into marital separate property.[5]  Although the deed stated that Ray "remise[d], release[d] and forever quitclaim[ed]" his interest in the property to Sandra, nothing on the face of the deed indicates

---

[5]    The other two means of converting marital partnership property into marital separate property — an agreement pursuant to the HUPAA or the special treatment of a gift or inheritance — are not implicated in the instant case.

that it was intended to alter Ray's right to an equitable division of the property upon divorce, or to convert the property to marital separate property. Thus, although the language of the deed effectuated a change in who held title to the property, it was not, standing alone, sufficient to remove the property from the marital partnership. See Reithbrock v. Lange, 128 Hawaiʻi 1, 16 n.9, 282 P.3d 543, 558 n.9 (2012) (noting that awarding property solely on the basis of which spouse holds title would conflict with the partnership model of property division).

Accordingly, this court must look to the circumstances surrounding the quitclaim deed to determine whether it was intended to alter the disposition of the Kahalakua property.[6] According to Ray, he signed the deed to protect the property from lawsuits, and he and Sandra intended to eventually "restore the title to joint ownership." However, according to Sandra, Ray signed the quitclaim deed because she told him, "I need security." Sandra further testified that, pursuant to the deed, she "gave up" the $100,000 due to her under the MOU in exchange for receiving the entire Kahalakua property.

The family court credited Ray's explanation for the

---

[6] Thus, the ICA erred in concluding that "[Ray's] statements regarding intent were inadmissible for purposes of contradicting the deed's clear language." Although the deed was unambiguous with respect to the transfer of title, it was ambiguous with respect to whether it was intended to alter the division of the property upon the parties' divorce. Accordingly, the ICA was incorrect in stating that "[t]he Family Court erred in failing to classify the Property as [Sandra's] separate property pursuant to the plain language of the deed."

quitclaim deed, finding that, "[a]fter discussions with Sandra, Ray thought the Quitclaim deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when things returned to normal."  Although Sandra challenged this finding on appeal, it is supported by substantial evidence in the form of Ray's testimony.  In re Doe, 95 Hawai‘i 183, 190, 20 P.3d 616, 623 (2001) ("[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." (internal quotation marks and brackets omitted)).  Accordingly, the family court's finding is not clearly erroneous, and it is therefore binding on this court.

Based on the family court's finding, the parties did not intend the quitclaim deed to alter the disposition of their marital partnership property upon their divorce.  Accordingly, the quitclaim deed did not bar the family court from equitably dividing the Kahalakua property.  Thus, this court need not determine whether the quitclaim deed was unconscionable or agreed to under duress.[7]

---

[7] In general, a deed is not a contract.  See, e.g., Brown v. Brown, 501 So. 2d 24, 26 n.1 (Fla. Dist. Ct. App. 1986) ("As distinguished from covenants of warranty, et cetera, which are often in a deed but which are not essential to its character, a deed is not a contract.  A deed does something (conveys land) as distinguished from promising to do something."). Nevertheless, to the extent the parties here treat the quitclaim deed as a contract, it is well settled that "there must be a meeting of the minds on all essential elements or terms in order to create a binding contract."  Moss v. Am. Int'l Adjustment Co., 86 Hawai‘i 59, 63, 947 P.2d 371, 375 (1997) (internal quotations marks and citation omitted).  Because Ray thought that the deed would protect the property from lawsuits and that title would
(continued...)

We next must determine whether either of the parties' other two agreements are enforceable. In her appeal to the ICA, Sandra described the October 6, 2008 agreement, the MOU, and the quitclaim deed as a "series of agreements for their divorce," and maintained that each of the agreements was enforceable. However, Sandra also argued that, even if the family court's findings and conclusions regarding the quitclaim deed are affirmed, the October 6, 2008 agreement and subsequent MOU should nonetheless be enforced. Consistent with this view, Sandra continues to argue in this court that all three agreements are enforceable. Accordingly, we next consider whether the MOU is enforceable.

B. **In general, a postmarital agreement is unconscionable if it is impermissibly one-sided and is the result of unfair surprise**

As stated, the family court must enforce all valid and enforceable postmarital and separation agreements. See Epp, 80 Hawaiʻi at 87, 905 P.2d at 62. A postmarital or separation agreement is enforceable if the agreement is "not unconscionable and has been voluntarily entered into by the parties with the knowledge of the financial situation of the [other] spouse." See Lewis v. Lewis, 69 Haw. 497, 501, 748 P.2d 1362, 1366 (1988); see also Chen v. Hoeflinger, 127 Hawaiʻi 346, 356-57, 279 P.3d 11,

[7](...continued)
eventually be restored to joint ownership, and Sandra thought that Ray signed the deed in order to provide her with "security," there plainly was no meeting of the minds with respect to the effect of the deed.

21-22 (App. 2012).[8]  Ray argues that the ICA applied the wrong legal standard for determining unconscionability.  For the reasons set forth below, Ray's argument is without merit.

Unconscionability encompasses two principles: one-sidedness and unfair surprise.  Lewis, 69 Haw. at 502, 748 P.2d 1366.  One-sidedness (i.e., substantive unconscionability) means that the agreement "leaves a post-divorce economic situation that is unjustly disproportionate."  Id.  Unfair surprise (i.e., procedural unconscionability) means that "one party did not have full and adequate knowledge of the other party's financial condition when the [marital] agreement was executed."  Id.  A contract that is merely "inequitable" is not unenforceable.[9]  Id. at 500, 748 P.2d at 1366.  The unconscionability of an agreement regarding the division of property is evaluated at the time the

_____

[8]    Some jurisdictions have concluded that postmarital agreements are subject to greater scrutiny than premarital agreements because of the nature of the marital relationship.  See, e.g., Bedrick v. Bedrick, 17 A.3d 17, 27 (Conn. 2011) ("This leads us to conclude that postnuptial agreements require stricter scrutiny than prenuptial agreements.").  The dissent adopts such a view, arguing that "transactions between spouses should be subject to the general rules governing fiduciary relationships," and that "an agreement that [is] not in accordance with fiduciary standards should be presumptively involuntary and unenforceable."  Dissent at 28-29.  Neither the family court nor the ICA concluded that a heightened standard should be applied in evaluating postmarital agreements, and neither party has argued that this court should apply such a standard.  We therefore do not consider whether postmarital agreements should be subject to greater scrutiny than premarital agreements.

[9]    Although the family court stated in the divorce decree that it would be "inequitable to enforce the agreements entered into by the parties," the family court's findings of fact and conclusions of law indicate that the family court concluded that "it would be unconscionable to award Sandra the Kahala Kua property by enforcing the Quitclaim Deed," not merely "inequitable."  The family court therefore applied the correct legal standard in determining whether the deed was unconscionable.

-24-

agreement was executed.  See id. at 507, 748 P.2d at 1369.

Generally, "[a] determination of unconscionability . . . requires a showing that the contract was both procedurally and substantively unconscionable when made," but there may be "exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone."  Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828-29 (N.Y. 1988); see also Adler v. Fred Lind Manor, 103 P.3d 773, 782 (Wash. 2004) (en banc) ("individual contractual provisions may be so one-sided and harsh as to render them substantively unconscionable despite the fact that the circumstances surrounding the parties' agreement to the contract do not support a finding of procedural unconscionability"); Maxwell v. Fidelity Fin. Servs., Inc., 907 P.2d 51, 59 (Ariz. 1995) (concluding under state statute that "a claim of unconscionability can be established with a showing of substantive unconscionability alone").  Although some courts have concluded that "[t]o be unenforceable, a contract must be both procedurally and substantively unconscionable," see, e.g., Marin Storage & Trucking, Inc. v. Benco Contracting and Eng'g, Inc., 107 Cal. App. 4th 1042, 1052 (Cal. Ct. App. 2001), most authorities have recognized that, in at least some cases, substantive unconscionability, without more, can render an agreement unenforceable, see Restatement (Second) of Contracts § 208 cmt. c (1981) ("Theoretically it is possible for a contract

-25-

to be oppressive taken as a whole, even though there is no weakness in the bargaining process and no single term which is in itself unconscionable."); 7 Joseph M. Perillo, Corbin on Contracts § 29.1 at 377 (revised ed. 2002) ("Some cases hold that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable, but there is no basis in the text of [Uniform Commercial Code §2-302] for such a conclusion." (footnotes omitted)). Indeed, the courts of this state have recognized that, under certain circumstances, an impermissibly one-sided agreement may be unconscionable even if there is no unfair surprise.

For example, in Kuroda v. Kuroda, 87 Hawai'i 419, 428 (App. 1998), the court held that a postnuptial agreement was unconscionable where it awarded the wife all personal and real property held in common, implicitly allowed the wife to keep her personal property including her accounts, required the husband to pay the wife one half of his net income from every source until either spouse passed away, and required the husband to pay all attorney's fees and costs associated with the separation and divorce. The Kuroda court reached this conclusion without considering whether there was unfair surprise. Thus, although under Hawai'i law "two basic principles are encompassed within the concept of unconscionability, one-sidedness and unfair surprise," Lewis, 69 Hawai'i at 502, 748 P.2d at 1366, in certain

-26-

circumstances, one-sidedness alone can render an agreement unconscionable, see Kuroda, 87 Hawaiʻi at 428, 958 P.2d at 550.

Here, the ICA applied the correct legal standard in its memorandum opinion. Specifically, the majority stated that "there need not be both one-sidedness and unfair surprise in reaching a determination that a marital agreement is unconscionable." The ICA concluded, however, that the quitclaim deed was not "so outrageously oppressive as to be unconscionable in the absence of unfair surprise."

Ray nevertheless argues that instead of applying the well settled law, "the ICA held that a marital agreement is only enforceable if there is both one-sidedness and unfair surprise." Ray's description of the ICA's analysis does not accurately characterize the approach taken by that court. The ICA did not hold that one-sidedness, without more, would never be enough to find an agreement unconscionable. Instead, the ICA concluded that the deed was not so "one-sided that it is unconscionable even without a showing of unfair surprise." Thus, the ICA plainly applied the correct legal standard in considering the validity of the deed.

Ray also appears to argue that this legal standard is overly narrow. According to Ray, "a marital agreement is unenforceable if it is one-sided," and unconscionability in the context of marital agreements does not require a showing of unfair surprise. Put another way, Ray appears to argue that a

marital agreement need not be <u>exceptionally</u> one-sided in order to be unconscionable. Ray further argues that requiring a showing of unfair surprise is absurd in the context of postmarital agreements because spouses "are in an obvious[ly] better position to be knowledgeable about their spouse's financial condition."

Ray's arguments are without merit. First, Ray does not cite to any cases invalidating a postmarital agreement solely on the basis of that agreement being somewhat one-sided.[10] Furthermore, parties may have legitimate reasons for entering into a somewhat one-sided postmarital agreement, and may do so knowingly and voluntarily. Permitting the family court to invalidate such agreements without requiring a showing of extraordinary one-sidedness would frustrate the purpose of HRS § 572-22, which permits spouses to enter into enforceable contracts with each other.

Accordingly, the ICA applied the correct legal standard in evaluating unconscionability.

---

[10] Ray cited two cases involving unconscionability in divorce actions. The first, <u>In re Marriage of Thomas</u>, 199 S.W.3d 847, 860 (Mo. App. 2006), does not support Ray's argument because the court there noted that parties are bound to the provisions of a pre-nuptial agreement "only if the agreement was conscionable <u>and</u> fairly made," i.e., both substantively and procedurally conscionable. <u>Id.</u> at 852 (emphasis added). Additionally, the court emphasized a similar standard of one-sidedness as that articulated by the ICA: "An agreement is unconscionable when the inequality is so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." <u>Id.</u> (internal quotation marks and citation omitted). Similarly, in the second case, <u>In re Marriage of Manzo</u>, 659 P.2d 669, 671 (Colo. 1983), the court considered both whether the agreement was procured through "overreaching, fraud, concealment of assets, or sharp dealing," and whether it was substantively "fair, just and reasonable." <u>Id.</u> at 675.

## C.   The MOU is not unconscionable

Ray argues that the marital agreements were one-sided and therefore unconscionable.[11]  In her response to this court, Sandra agrees that it would be one-sided to award the Kahalakua property to her in its entirety pursuant to the deed.  Sandra argues, however, that the MOU is not "unjustly disproportionate" because Ray would receive 25% of the proceeds of the sale of the property, in addition to any cash accounts and retirement benefits awarded by the family court.  (Citing Chen, 127 Hawaiʻi at 357, 279 P.3d at 22).

Although the family court did not address whether the MOU is unconscionable, this court may nonetheless reach the issue because unconscionability is a question of law, reviewable de novo.  See, e.g., HRS § 490:2-302(1).  For the reasons set forth below, the MOU is not unconscionable with respect to the division of the Kahalakua property, nor is it unconscionable to the extent it required Ray to pay Sandra $100,000 in lieu of alimony.[12]  The MOU is therefore an enforceable marital agreement with regard to these clauses.

Again, the terms of the MOU were as follows:

_____

[11]    Nothing in the record suggests that Ray was surprised by the terms of the MOU, and Ray did not argue otherwise in his answering brief or application.  The only issue, therefore, is whether the MOU was so impermissibly one-sided that it is unconscionable.

[12]    Although the MOU also addressed Ray's tools and building equipment, the contents of the house, and the couple's vehicles, the disposition of those items is not being disputed by the parties.

> This Agreement between Donald Balogh and Sandra Balogh will be implemented if they are to separate and/or divorce from each other.
>
> Their assets will be divided as follows:
>
> . . . .
>
> 3. In regards to the proceeds of the house, due to a sale: Sandy will receive 75% of the sale proceeds and Ray will receive 25% of the proceeds.
>
> 4. In regards to compensation: Ray agrees to pay $100,000.00 to Sandy in lieu of Alimony and court proceedings.

Even if the allocation of the entire Kahalakua property to Sandra pursuant to the quitclaim deed could be characterized as so one-sided as to have been unconscionable, the 75%/25% split set forth in the MOU and the requirement that Ray pay $100,000 in lieu of alimony are not. First, in addition to his share of the Kahalakua property, Ray was entitled to an equitable share of the couple's other major assets, which totaled $760,000.[13] Second, although Ray will receive a lesser share of the proceeds under the MOU than he would under the family court's 50%/50% division of the property, such imbalance was the express purpose of the MOU. As the family court found, "Sandra believed Ray would tell her the truth and stop his inappropriate behavior by signing the MOU. Ray signed it in his desperate attempt to hold the marriage together." It is unlikely that the MOU would have been construed as demonstrative of Ray's commitment to the marriage had it

---

[13] The record does not indicate the exact values of Ray's and Sandra's respective shares of their other assets. Based on the family court's calculations, however, it appears that Ray and Sandra each received about half of the other assets.

provided for the same division of property Ray was likely to receive in the family court under an equitable division upon divorce.  Moreover, as noted above, "unless the agreement rises to the level of unconscionability, a merely 'inequitable' contract is not unenforceable under contract law."  Lewis, 69 Haw. at 500, 748 P.2d at 1365-66.  Accordingly, the 75%/25% division of the Kahalakua property and the $100,000 payment set forth in the MOU are not unconscionable.

**D.    The MOU was entered into voluntarily**

Ray also argues that the ICA erred in vacating the family court's decision because he did not enter into each of the marital agreements voluntarily.  For the reasons set forth below, Ray executed the MOU voluntarily.[14]

"Involuntariness is shown by evidence of 'duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness.'"  Chen, 127 Hawaiʻi at 357, 279 P.3d at 22 (quoting Prell, 114 Hawaiʻi at 298, 162 P.3d at 14).  Here, the family court concluded that Ray was "under duress and coercion when he signed the agreements" because of the ongoing construction of the Kahalakua home, the contractor walking off and the resulting mechanic's lien, the penalties assessed by the homeowner's association and the resulting

---

[14]    For the reasons stated above, this court need not address whether the quitclaim deed was voluntarily executed.  Moreover, because we conclude that the MOU is enforceable, we do not consider the voluntariness of the October 6, 2008 agreement.

litigation, the demands of Ray's job, the continuing issues with subcontractors, and Ray's uncontrollable obsessive behavior.  The family court's factual findings, however, are not sufficient to support a conclusion that Ray signed the agreements under either duress or coercion.[15]

Duress is defined as "a threat of harm made to compel a person to do something against his or her will or judgment; [especially], a wrongful threat made by one person to compel a manifestation of seeming assent by another person to a transaction without real volition."  Black's Law Dictionary 614 (10th ed. 2014).  It is well established that an agreement is voidable due to duress when "a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative."  Standard Fin. Co., Ltd. v. Ellis, 3 Haw. App. 614, 621, 657 P.2d 1056, 1061 (1983) (quotation marks and citation omitted); see also Restatement (Second) of Contracts § 175(1) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.").[16]

---

[15]    It appears that the family court used the terms duress and coercion interchangeably, i.e., there is nothing in the Findings of Fact and Conclusions of Law to indicate that the court viewed them as legally distinct terms.  We address each doctrine separately.

[16]    Section 175(2) of the Restatement concerns improper threats made by a third party to induce the recipient to enter into a contract.  However, Ray does not contend, and the record does not suggest, that any third party threatened Ray to enter into the agreements.

A threat of divorce does not constitute an improper threat since the party making it has the legal right to seek a divorce. See Kam Chin Chun Ming v. Kam Hee Ho, 45 Haw. 521, 558, 371 P.2d 379, 402 (1962) (it is not duress for a party to "threaten to do what they had a legal right to do"); see also Rubenstein v. Sela, 672 P.2d 492, 494 (Ariz. Ct. App. 1983) (concluding that husband's threat to leave the marriage did not constitute duress because he had a right to leave the marriage); Autin v. Autin, 617 So.2d 229, 233 (La. Ct. App. 1993) (holding that "a threat of doing a lawful act or a threat of exercising a right does not constitute duress").

However, a threat of exposure of publicly embarrassing information can be the basis of a claim of duress. See Restatement (Second) of Contracts § 176(2) ("A threat is improper if the resulting exchange is not on fair terms, and . . . the threatened act would harm the recipient and would not significantly benefit the party making the threat"); id. cmt. f ("A typical example is a threat to make public embarrassing information concerning the recipient unless he makes a proposed contract.").

The record here does not support a finding that Ray's assent to the MOU was induced by an improper threat by Sandra and that he had no reasonable alternative to signing that agreement. There was conflicting testimony regarding whether Sandra had threatened Ray in order to get him to sign any of the documents.

Sandra repeatedly testified that she did not threaten Ray in connection with the two agreements and the deed. Ray testified at one point that Sandra had told him that if he did not sign, she would tell family members about his behavior and that she would "go public" with that information.[17]

In its findings of fact and conclusions of law, however, the trial court did <u>not</u> find that Sandra had threatened Ray. Rather, it simply identified a number of factors that contributed to Ray's "extreme distress," ranging from problems with the construction to "his uncontrollable obsessive behavior that escalated from his backyard nudity to public display, his shame and embarrassment, his fear of being discovered, and the constant argument with Sandra about his inappropriate behavior." Moreover, Ray failed to establish that he had no reasonable alternative to signing the MOU. Ray could have declined to sign the MOU but still attempted to resolve his issues with Sandra in

_____

[17] At another point Ray appeared to deny that Sandra had threatened him. However, this testimony was subject to an objection that was sustained by the court:

> Q. So was it -- was there a -- threat of divorce or exposure to others--
> <u>A. No.</u>
> <u>Q.</u> -or --
>    MR. HIOKI: Objection, leading, Your Honor.
>    THE COURT: Getting there. Sustained.
> Rephrase the question.

(Emphasis added).
     Sandra argues that because the answer was not stricken from the record, it is in evidence. Even assuming arguendo that Ray's response can be considered, the fact remains that there was conflicting testimony on this issue, and the family court implicitly resolved those conflicts in Sandra's favor when it declined to find that she had threatened Ray.

an effort to save the marriage.  In sum, because the family court did not make a finding that Sandra had improperly threatened Ray, and since Ray had a reasonable alternative to signing the MOU, the record does not support the family court's conclusion that Ray signed that agreement under duress.

The record also does not support a conclusion that the MOU was the result of coercion.  Coercion is defined as "[c]ompulsion of a free agent by physical, moral, or economic force or threat of physical force."  Black's Law Dictionary 315 (10th ed. 2014).  "Coercion sufficient to avoid a contract need not . . . consist of physical force or threats of it.  Social or economic pressure illegally or immorally applied may be sufficient."  Billouris v. Billouris, 852 N.E.2d 687, 693 (Mass. App. Ct. 2006).  For all the reasons set forth above, the record does not support a conclusion that Sandra employed physical, moral, or economic force to obtain Ray's assent.

Although the family court found Ray was under stress due to a variety of factors, those factors do not establish either duress or coercion.  Moreover, Ray cannot rely on those factors to establish that he lacked mental capacity when he signed the agreements, since he had specifically agreed prior to trial that he was "not claiming lack of mental capacity as to any issue herein."  Ray therefore executed the MOU voluntarily.

In sum, the record does not support the family court's conclusion that Ray's assent to the MOU was the product of duress

and coercion.  The dissent does not dispute that analysis, but rather suggests that the family court did not intend to rely specifically on those doctrines, as opposed to other potential grounds for finding that Ray's assent was involuntary.  See Dissent at 10-24.  Respectfully, the family court's Conclusion of Law P quite specifically refers to "duress and coercion" as the basis for invalidating the agreement, and the court's accompanying citation to the Prell case implies that its reliance on those two doctrines was intentional.

In any event, we respectfully disagree with the dissent's contention that Ray did not enter into the MOU voluntarily because his "mental state was extremely vulnerable", he was unduly influenced, and "other circumstances" demonstrate involuntariness.  Dissent at 15, 22-24, 17-22.  First, to the extent the dissent suggests that Ray's "mental state" deprived him of the capacity to contract, Ray explicitly agreed prior to trial that he was not claiming a lack of mental capacity.

Second, the record does not establish that Ray was unduly influenced.  Undue influence is "[t]he improper use of power or trust in a way that deprives a person of free will and substitute's another's objective."  Black's Law Dictionary 1760 (10th ed. 2014); Cvitanovich-Dubie v. Dubie, 125 Hawaiʻi 128, 160, 254 P.3d 439, 471 (2011).  As a threshold matter, the family court did not find that Sandra exerted undue influence over Ray, and Ray does not argue otherwise in this court.  Moreover, the

-36-

record does not support a conclusion that Sandra either attempted to impose or actually imposed improper influence on Ray.

Finally, there are no "other circumstances" indicating a lack of free will on Ray's part. The dissent asserts that Ray was motivated by saving the marriage and that Ray believed he had no other choice but to sign the agreements. Dissent at 21. The facts of this case, however, do not support a conclusion that Ray executed the MOU involuntarily. As noted above, Ray was well educated, with a bachelor's and master's degree in electrical engineering, and he held a high-level security clearance. There is no suggestion in the record that Ray was unaware of what he was doing, nor do the facts otherwise support a conclusion that the MOU was the result of a lack of free will. In fact, Ray expressly testified that he agreed to all of the terms of the MOU. While Ray was under stress from a number of sources, that stress is not sufficient to establish that the MOU was not entered into voluntarily.

The dissent also asserts that the MOU is voidable for a lack of consideration. Dissent at 29. The family court, however, made no findings or conclusions relating to the adequacy of consideration, and Ray has made no argument in this regard to this court. Thus we do not consider the issue.

We therefore vacate the family court's conclusions of law N, P (in part), Q, and R. We vacate conclusion of law N because the family court treated the quitclaim deed as a

-37-

separation agreement.  We vacate conclusion of law P to the extent the family court concluded that Ray signed the agreements under duress and coercion.  We vacate conclusion of law Q because the family court concluded that the parties' agreements were unenforceable.  Finally, we vacate conclusion of law R because it awarded Ray and Sandra each a fifty-percent interest in the Kahalakua property.

## IV.  Conclusion

For the foregoing reasons, the ICA's judgment is vacated, the family court's divorce decree is vacated, and the family court's findings of fact and conclusions of law are affirmed in part and vacated in part.  The case is remanded to the family court for further proceedings consistent with this opinion.

Rebecca A. Copeland
for petitioner

Stephen T. Hioki
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Derrick H.M. Chan

