**Electronically Filed
Supreme Court
SCWC-19-0000446
05-NOV-2020
07:46 AM
Dkt. 7 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

L.R.O., Respondent/Plaintiff-Appellee,

vs.

N.D.O., Petitioner/Defendant-Appellant.

SCWC-19-0000446

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000446; FC-D NO. 16-1-1111)

NOVEMBER 5, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ.,
AND CIRCUIT JUDGE CHANG, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

Our state's version of the Uniform Premarital

Agreement Act (UPAA) provides that a premarital agreement (PMA)

is enforceable unless one of the parties proves they did not

execute it voluntarily. Hawai'i Revised Statutes (HRS) § 572D-

6(1) (2018). Petitioner N.D.O. (Wife) argued throughout the

parties' divorce proceeding that she involuntarily executed a PMA prior to her marriage to L.R.O. (Husband).  We conclude that the family court did not err in rejecting that argument and by enforcing the PMA.  However, to provide further guidance to the family courts, we adopt the California Supreme Court's test for voluntariness in PMAs under the UPAA.  We further hold that Wife's other asserted points of error are meritless, and we affirm the judgment of the Intermediate Court of Appeals (ICA) and the Family Court of the First Circuit (family court).

## II.  BACKGROUND

This appeal arises from a Divorce Decree between parties Wife and Husband.  In Wife's application for writ of certiorari, she argues that the family court erred by: (1) awarding full physical custody of the parties' minor child to Husband based on the custody evaluator's allegedly biased opinion; (2) enforcing a PMA between the parties that Wife alleged was unconscionable and entered into involuntarily; and (3) failing to find that Husband abused the temporary restraining order (TRO) process to gain advantage in the custody dispute.

### A.    Family Court Proceedings

The facts of this case are complex, and Wife and Husband presented two drastically different versions of events. The following background facts are undisputed.

2

In 2013, Wife's aunt, J.D., who lived in Hawai'i, approached Husband, who used to live in J.D.'s building, because she wanted to introduce Husband to her niece (Wife) who lived in Vietnam. After Husband and Wife electronically communicated for several months, J.D. and Husband traveled to Vietnam in December 2013; J.D. paid for Husband's flight. Husband met Wife in person for the first time on this trip, at which point Husband was 45 years old and Wife was 22 years old. Four months later, Husband returned to Vietnam and proposed to Wife, who accepted. Wife came to the United States in June 2014 on a K-1 fiancée visa, allowing her 90 days to marry Husband.

On August 13, 2014, the parties entered into the PMA,[1] which contained terms releasing the parties from "any alimony or support obligations." The PMA also provided that each spouse's property upon entry into the marriage would be treated as separate. Further, the PMA stated, "It is the intention of the husband in the event that he sells his current residence . . . that any equity shall be used to finance another shared property with the wife and said equity will be considered shared and

---

[1] The six-page PMA was entered into evidence along with "Schedule A1" which listed Husband's assets as follows:

> 1. Federal [Thrift] Savings Plan (government retirement) current value is $150k and all future payouts
>
> 2. Federal Annuity (government retirement)
>
> 3. Primary Residence, [address omitted]

joint property."  Husband and Wife were married the same day they signed the PMA by an officiant Husband hired using Craigslist.

Husband and Wife's only child together was born in Honolulu in May 2015.  Both spouses acknowledged that there was discord in the home before and after the child's birth, and the police came to the couple's home several times.  Each spouse alleged physical abuse at the hands of the other.  Wife also alleged that Husband abused her emotionally and financially.  During the marriage, Wife and the minor child spent approximately six months in Texas over the course of three separate trips, residing with Wife's aunt, D.D.  Husband filed for divorce on August 25, 2016, while Wife was in Texas.  On September 22, 2016, Husband petitioned for a TRO on behalf of himself, their child, and M.F.O., Husband's teenage son from a prior marriage; the TRO was granted.[2]  Wife returned to Hawai'i

---

[2]     Husband's petition alleges the following instances of abuse, rephrased for clarity:

(1) On May 19, 2016, Wife bit Husband.

(2) In July 2016, Wife was "acting violent" toward Husband while he was confined to bed recovering from a stroke at the Rehabilitation Hospital of the Pacific; Wife was banned from the hospital.

(3) In late July 2016, Husband was "forced to flee" his house because of Wife's actions.

(4) On September 14, 2016, Wife sent Husband an email wishing him "ill will."

from Texas on September 29, 2016, and was served with the TRO at the airport, where Husband took custody of the child. On November 2, 2016, Husband stipulated to visitation between Wife and the minor child, removing the child from the TRO.

The family court[3] appointed Dr. Reneau Kennedy as a custody evaluator tasked with investigating the family's situation and making a custody recommendation. Dr. Kennedy submitted a 112-page report.

1. **Trial Testimony**

a. **Dr. Reneau Kennedy**

Dr. Kennedy is a licensed psychologist in Hawai'i. Dr. Kennedy's custody evaluation report was entered into evidence. She concluded that Husband "has a better sense of what the child needs and is focused on the child's best interest." Further, Dr. Kennedy stated, "[T]here is a question in my mind . . . whether mother does have capacities that really focus on the best interest from a legal perspective[.]" Dr. Kennedy stated that she relied on interviews with the parents, the parents' contacts, collateral data from subjects, and documents provided to her. Her ultimate recommendation was an 80/20 custody split in Husband's favor.

---

[3] The Honorable Paul T. Murakami and the Honorable Kevin T. Morikone presided over the proceedings in family court. Judge Morikone presided over the trial.

Dr. Kennedy testified that her report included information from neighbors and others indicating that Wife had, at times, left the minor child in the house alone for up to two hours at a time while she allegedly met with other men. Dr. Kennedy opined that, possibly as a result of being left alone, the child was "not on course" developmentally. Placement in a special program brought the child up to speed, but Dr. Kennedy indicated Wife was resistant to the program.

Dr. Kennedy also testified that, according to the child's preschool teacher, the child's demeanor differed based on which parent dropped him off: with Wife, the child was "clingy," "preverbal," and "often in diapers"; with Husband, the child "act[ed] age appropriate[ly]." Additionally, Wife sometimes kept the child home from school on the days she had custody, which Dr. Kennedy viewed as a failure to prioritize the child's education.

Regarding Wife's immigration status, Dr. Kennedy stated that Wife's "green card is pending based on her [Violence Against Women Act] claim." Dr. Kennedy's report states that in June 2018, Wife received a notice from United States Citizenship and Immigration Services (USCIS) that she was granted "deferred" action, giving her case "lower priority for removal" until

September 14, 2019.[4]

Dr. Kennedy testified that she visited the residence of Wife and her boyfriend, S.A., to observe them with the child. Dr. Kennedy also separately interviewed S.A. in her home office.

On cross-examination, Dr. Kennedy testified that, although she interviewed J.D. on July 10, 2018, the notes from that interview were mistakenly omitted from her report. Dr. Kennedy indicated that J.D. acknowledged that Wife had several extramarital affairs. In addition, Dr. Kennedy stated that J.D. said negative things about Husband.

The following exchange occurred between Wife's counsel and Dr. Kennedy:

> Q     So, Dr. Kennedy, when you talked to mom about her concerns about father, what was one of the biggest concerns she said?
>
> A     I'll have to look.
>
> Q     You don't know off the top of your head what mother's biggest concern about father is?
>
> A     No.
>
> Q     Why not?
>
> A     Because there are multiple concerns --
>
> Q     Okay. Give me the top two --
>
> A     And they are documented in my report.
>
> Q     Top 3?
>
> A     Well --
>
> Q     You don't know any of them, do you?

---

[4]     The record indicates that Wife received her green card on February 8, 2019.

7

A     -- if I can refresh my memory?

. . . .

Q     It's very clear that you said "The following concerns about custody and parenting issues," the very first one you listed is that "He's an alcoholic with a temper"; isn't that right?

A     That's what the report says.

. . . .

Q     Okay.  Now in your interview with father -- all right.  Now I'm gonna give you time on this one -- you show me one point, one point where you confronted him or asked him about his consumption of alcohol.  And I'll wait 'cause I am going to assert you never brought up the alcoholism with father 'cause it's not –

. . . .

A     I haven't written that in my report --

Q     Thank you.

. . . .

A     I had a discussion with father about his drinking.

Q     Okay. How come that's not in your report when you talk about what you talked about with father then?

A     Simply because of all of the other information, all the other collaterals told me about the absence of father's alcohol abuse --

Q     But --

A     -- and his denial that he is an alcoholic.

Q     Did he deny it in your report?  Show us where.

A     I have not put that in my report.

Q     So why are you saying he has denied he's an alcoholic when it's not in this report?

A     I don't put every word of my interviews with people in my reports.

Q     Right.  But this is a concern that mother had that's one -- the first one listed.  Don't you think that's worth addressing later on?

8

A    And I did with multiple people --

Q    Right.

A    -- who said that father is not an alcoholic.

. . . .

Q    Isn't it true, ma'am, that she specifically told you he would drink when he got home and he wouldn't stop 'til he passed out at night and this happened almost every night?  Isn't that what she told you?

A    Never.

Q    She never told you that?

A    That is not her -- her information that she provided to me.

Dr. Kennedy went on to testify on cross-examination that she did not speak with any of Wife's other aunts because Wife did not list any others for Dr. Kennedy to interview.

Wife's counsel also cross-examined Dr. Kennedy with respect to an email that Husband sent to Wife on September 28, 2018 – after the court had granted him the TRO, but before Wife came back to Hawai'i from Texas – promising to help Wife transition to living on her own.[5]  Dr. Kennedy testified that she

---

[5]    Wife argues that this email was designed to "lure" her into returning to Hawai'i so that Husband could serve her with the TRO and remove the child from her care.  It stated that Husband will let Wife have the master bedroom in his house for a few days, after which she can move into a small bedroom in the house while she looks for her own place.  It appears from the email that Wife told Husband that she would like to stay with him for "two month[s] max" so she has time to establish other living arrangements.  The email also stated that Wife could use Husband's credit card during the transition and that Husband hired a nanny who would start the next week if Wife had job interviews.

Husband testified on cross-examination that he sent the email to Wife because he was not yet sure if he wanted to serve her with the TRO, and he thought the TRO would be effective only after service.

believed Husband meant to follow through on the promises in his email, notwithstanding that the TRO he had already obtained would preclude him from doing so.

With respect to the status quo of the custody arrangements, on cross-examination, Dr. Kennedy and Husband's counsel had the following exchange:

> Q     What does mother describe the current time-share schedule as?
>
> A     I don't know.  I have not been in contact with these folks for months.
>
> Q     What was it when you were in contact with them, ma'am?
>
> A     Um, she was getting the child on the weekends through Mondays.
>
> Q     You sure? 'Cause let me read you what you wrote.
>
> A     Okay. Well, that's fine.
>
> Q     Thank you.  "Mother describes the current time-sharing schedule as sharing half custody.  Week 1, mother has [the child] from Friday to Monday; Week 2, from Friday to Tuesday on a rotating schedule. . . .  So does that refresh your recollection as to what she said the current time-sharing was?
>
> . . . .
>
> A     I am saying that she did not have half custody.
>
> . . . .
>
> Q     Friday to Monday and Friday to Tuesday.  Friday, Saturday, Sunday, Monday, Tuesday, that's five days out of the week, isn't it?
>
> . . . .
>
> A     [N]o because he goes to school on Friday and he's supposed to be in school on Mondays and Tuesdays.
>
> . . . .
>
> Q     So my point is here you're a little generous with your time with father because you included all the time

that the child's in school as time with father, yeah?

A    Correct.

Q    Okay.  And the only time you included with mother is when he's not in school?

A    Correct.

**b.    Husband**

When directly examined about the PMA, Husband contended that he first showed a "general format[]" PMA to Wife and told her that "all men in the west" get PMAs.  Husband testified that Wife can "read English well" and understood the document.

Husband claimed that he presented Wife with the PMA "at least two weeks before" she signed it.  When asked whether Wife appeared to have reservations about the PMA, Husband contended that he modified the agreement to account for Wife's concerns about ownership of the equity in Husband's home.  Additionally, Husband contended that he encouraged Wife to have the document reviewed by a lawyer and gave her $300 and a credit card to do so.

Husband testified that both he and Wife signed the PMA on August 13, 2014 at approximately 9:00 a.m. in front of a notary.  Husband testified that Wife appeared comfortable when she signed the document and that he had done nothing prior to give her the belief that she must sign the PMA.  The parties were legally married that same day around 4:30 p.m.  According

to Husband, Wife requested the August 13 wedding date because she wanted to "get it over with" and the faster they got married, the faster they could apply for her green card and work permit. The parties had originally planned to get married in Las Vegas in September; Husband testified that he had pre-paid a vacation package.

Husband denied having ever had a drinking problem. With respect to Husband's claims of Wife's abuse, Husband recounted a day in May 2016 – which was also reflected in Husband's TRO petition – when Wife found emails from a dating site in Husband's email inbox and allegedly attacked Husband while he was in the shower with their child.

Husband recounted a series of verbal altercations with Wife, allegedly culminating in Wife hitting him in the face and on the side of the head five to ten times on the morning of July 12, 2016. Husband asserted that he then pushed Wife off of him, but that about half an hour later, he began to vomit and dry heave. Husband recounted that he called 911 a few hours later and was picked up by an ambulance and taken to Pali Momi hospital, where he stayed for four to five days. Husband contends that Dr. Sydney Lee conducted an MRI and told him that he had suffered a stroke caused by trauma to his vestibular artery in his neck, the same area where Wife struck him on July 12. Husband testified that he obtained a TRO against Wife

on November 2, 2016.[6]

On cross examination, Husband testified that he did not offer Wife a waiver of independent professional advice that would confirm that she knew she could have her own attorney review the PMA. Husband sat with Wife in their home while she read the PMA to herself. Additionally, Husband conceded that he told Wife he would not marry her unless she signed the PMA. Husband also admitted that the notary had recorded the PMA signing time as 2:45-2:50 p.m., which was closer to the wedding ceremony than the 9:00 a.m. time stated.

### c. J.D.

J.D. spoke about her interview with Dr. Kennedy, stating that she felt Dr. Kennedy was looking for bad things about Wife and good things about Husband. J.D. testified that she told Dr. Kennedy that Husband drinks too much and that Wife is a capable parent. J.D. stated that Dr. Kennedy did not specifically ask J.D. to speak poorly about Wife, but did ask J.D. if she knew about Wife's affairs with other men.

### d. S.A.

S.A. testified that he met Wife through a mutual friend on O'ahu in October 2016. They began dating in February

---

[6] The TRO petition does not include Husband's allegation that Wife hit him and caused him to have a stroke. In addition, Dr. Kennedy's report stated that the alleged hitting occurred on July 11, 2016, reflecting a discrepancy between the report and Husband's testimony at trial.

2017 and moved in together in March 2017.  S.A. testified that Wife's English "wasn't that good" when he met her and that it had "gotten a lot better" since.

S.A. testified that Wife is not abusive; after living together for almost two years, he had never seen her get angry or yell.  Further, S.A. stated that Wife's child was her first priority.

S.A. stated that Dr. Kennedy interviewed him at her home office for approximately an hour and a half but felt that she "wasn't listening" to him.  He told Dr. Kennedy that Wife is an "amazing" mother.  Dr. Kennedy allegedly told S.A. that Wife was an illegal alien who "has been asked multiple times to leave the country."  When S.A. reviewed Dr. Kennedy's final report, he noticed that it did not contain notes from his interview.  S.A. testified that Dr. Kennedy's statement in her report that this was his first experience with young children was false.

e.   **Wife**[7]

Wife testified that when she first met Husband, J.D. translated for them.  Wife stated that she started learning English in high school but had no English-speaking people to practice with.  When communicating with Husband in writing before coming to the United States, Wife used Google Translate.

---

[7]     Wife testified almost entirely in English, with an interpreter standing by who stepped in to assist when Wife asked for help.

Wife asserted that her child's perceived developmental delays were the result of her calling him by his middle name and speaking to him in Vietnamese; thus, a test in English that calls him by his first name would elicit no response.

Wife stated that Husband arranged for the couple to marry on August 13, 2014.  Husband first gave Wife the PMA around 3:00 that day, while they were at the mall.  Wife further testified as follows:

> Q     You were in a mall with [Husband] and he gave you – what happened? Describe it to the judge.
>
> A     So, uh, we walk around the mall and the guy called. He showed up.  And [Husband] asked me to, um, sign on the paperwork.
>
> Q     Did you read the agreement before you signed it?
>
> A     No.
>
> Q     Did you read any of the agreement?
>
> A     No.
>
> Q     Did [Husband] read it for you?
>
> A     No.
>
> Q     Did [Husband] explain it to you?
>
> A     He told me that, uh, this is the prenup that I have to sign.  I ask him what is the prenup and he told me that all rich western men have to do this before marriage.
>
> Q     Did he tell you what it would mean if you signed it?
>
> A     He told me that is – it's – it's mean that you don't touch my property if we divorce.  And – and – and I ask – and I told him that I am not sure about it.  And he told me that – he ask me if I'm planning on divorce him and I told him no.  And he told me, "Then why you even care?  But if you don't sign it now, then I'll kick you back Vietnam."

According to Wife, Husband did not tell her that she could have the PMA reviewed by her own attorney.  Wife testified

that she was afraid of being sent back to Vietnam because she had no place or belongings to return to, and it would be shameful to be sent back. The parties married "15 minutes or half an hour" after signing the PMA. Wife stated that Husband did not give her a copy of the PMA in Vietnam, and even if he had, she would not have understood it.

Wife stated that she felt Dr. Kennedy's report was "very unfair" because it was "very one-sided and far from the truth," omitted important information, and had incorrect information about dates of events. In addition, Wife testified that she sent Dr. Kennedy a list of individuals to interview, including D.D., but Dr. Kennedy did not contact D.D.

Wife was served with the TRO when she and the child returned to Honolulu from Texas. Police took the child from her and gave her an envelope with two hundred dollars and a credit card inside.

Wife stated that she knew what an agreement was generally but did not understand that the PMA was an agreement. She felt she had no choice but to sign it because she did not want to return to Vietnam and needed medical insurance for her pregnancy.

With respect to her alleged pregnancy, Wife stated that she informed Husband as soon as she found out, sometime in August 2014. Wife also stated that she saw a doctor, Dr. Chang,

16

after she miscarried, while Husband was in Guam for work; she told Dr. Chang that the miscarriage was due to abuse from Husband. However, Wife admitted that her statement was not in Dr. Chang's notes. Wife said that Dr. Chang told her that he would only put her report in his notes if she called the police. Because Wife did not want to involve the police, she did not ask Dr. Chang to include the abuse allegation in his notes.

Wife denied both hitting Husband in the neck on the morning of his stroke and hitting him at the Rehab Hospital. She also provided a different account of why she bit Husband on the arm in May 2015: Wife stated that Husband was not in the shower with their child and that she bit Husband to defend herself after he threw her on the ground and punched her on the left clavicle. Wife visited a psychologist soon after, who noticed the bruise and asked if she called the police. When Wife indicated she had not, the psychologist took a photo of the bruise.

Wife also provided an alternate account of the morning of Husband's stroke. Wife said that Husband began drinking at 5:00 p.m. the day before, despite admitting that his doctor told him not to drink. Wife asked him to stop drinking, but he continued. According to Wife, Husband brought up Wife's past affairs, and they argued until about midnight, Husband drinking the entire time. They went to bed, and Husband told Wife that

17

he had sex with 18-year-old twins in Thailand. Wife testified that she asked Husband to stop talking about it, but he continued, in detail, about his sexual encounters with other women. Wife then told him, "If you say it again, I'm gonna slap your mouth." According to Wife, Husband continued, so she slapped him on the lips with an open hand. Around 1:00 a.m., Wife walked outside for about fifteen minutes and came back in. At this point, Wife alleges that Husband raped her. They fell asleep until 8:00 a.m., when Husband began to show symptoms of the stroke. Wife acknowledged that Husband took his ex-wife to the military base around 10:00 p.m. the night before the stroke and stated that, although Husband was drunk, military police did not stop him.

Wife confirmed that she regularly kept the child home from school on the Mondays she had custody because she believed that strengthening their bond was more important. After her interview with Dr. Kennedy, in which Dr. Kennedy told her that it was better for the child to go to school, Wife began following that recommendation.

2. **Family Court's FOFs and COLs**

The family court's order contained the following findings of fact (FOFs), which are at issue in Wife's application for certiorari:

15. After being introduced, Plaintiff and Defendant communicated with each other by e-mail and text message. Said communications were in the English language.

16. Defendant learned English as a second language in elementary school and through high school. Although a second language, Defendant understood English.

. . . .

19. While the parties were in Thailand, the parties discussed the possibility of marriage and Plaintiff raised the issue of a [PMA] and that Defendant would be required to execute a PMA before the parties would marry.

. . . .

28. A few weeks prior to the execution of the PMA, Plaintiff provided a copy of the PMA to Defendant and Defendant reviewed the same. The parties discussed the content of the PMA and the portions that Defendant did not like.

29. Plaintiff made changes to the initial draft of the PMA to address Defendant's concerns.

30. There was no credible or reliable evidence that Defendant did not voluntarily execute the PMA.

. . . .

32. There was no credible or reliable evidence to support the assertion that Defendant did not understand the terms of the PMA.

33. There was no credible or reliable evidence that the terms of the PMA [were] unconscionable at the time of the execution of the PMA.

34. There was no credible or reliable evidence that the terms of the PMA [were] unconscionable at the time of trial.

. . . .

43. The Court found Dr. Kennedy's report and testimony credible and persuasive. Notwithstanding[,] however, approximately six (6) months elapsed between the filing of the report and the completion of trial.

. . . .

45. Father took a pro-active approach with respect to the child's education and Mother did not.

. . . .

48. Although domestic violence between the parties were alleged by both sides, Dr. Kennedy[,] through her extensive investigation, believed that Father's accounts were more credible and the Court agreed with the same.

. . . .

53. Based upon the credible and reliable evidence adduced at trial, the Court found that it is in the best interests of the child that the then[-]existing timesharing schedule be modified.

. . . .

60. Based upon the credible and reliable evidence, orders requiring alimony to be paid to either party were precluded by the PMA.

. . . .

The family court further entered the following conclusions of law (COLs) at issue in Wife's application for the writ of certiorari:

6. The terms of the PMA did not violate HRS § 572D-3.[8]

---

8    HRS § 572D-3 (2018) states:

(a) Parties to a premarital agreement may contract with respect to:

(1)    The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;

(2)    The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

(3)    The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

(4)    The modification or elimination of spousal support;

(continued . . .)

. . . .

10. Based upon the credible and reliable evidence, the Court did not find that Defendant was forced to execute the PMA. On the contrary, based upon the credible and reliable evidence, the Court found that Defendant voluntarily executed the PMA.

. . . .

13. Based upon the reliable and credible evidence, the Court found that Husband provided a copy of the PMA to Wife a few weeks prior to the execution of the PMA.

. . . .

20. Based upon the credible and reliable evidence, the Court found that neither the terms governing property division, nor the terms eliminating spousal support were unconscionable.

. . . .

33. Based on the credible and reliable evidence presented, as well as the relevant factors enumerated in HRS 571-46(b), the Court finds that it is in the best interest of the child that Father be awarded primary physical custody of the child, subject to Mother's visitation rights outlined below.

. . . .

49. The enforcement of the PMA precludes an award of alimony to either party.

---

(5) The making of a will, trust, or other arrangement to carry out the provisions of the agreement;

(6) The ownership rights in and disposition of the death benefit from a life insurance policy;

(7) The choice of law governing the construction of the agreement; and

(8) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

(b) The right of a child to support may not be adversely affected by a premarital agreement.

21

**B. ICA Proceedings**

**1. Wife's Opening Brief**

Wife presented ten points of error, consolidated for clarity as follows:

1. The family court erred by awarding sole physical custody of the minor child to Husband.

2. The family court erred by enforcing the PMA, rejecting Wife's contention that she was coerced into signing it or signed under duress.

3. The family court erred by failing to require Husband to pay child support.

4. The family court erred by entering FOFs 15, 16, 19, 28, 29, 30, 32, 33, 34, 35, 43, 44, 45, 48, 49, 53, 57, 60, 61, 62, 63, and 64.[9]

5. The family court erred by entering COLs 6, 10, 13, 20, 33, 41, 44, 49, 50, and 51.

6. The family court erred by declining to admit an email between the parties in which Husband admitted to consuming "too much" alcohol.

We address only arguments Wife made in the ICA that relate to her claims on certiorari.

Wife first argued that the best interests of the child

_____

[9] Concomitantly, Wife contended that the family court erred by declining to enter Wife's proposed FOFs and COLs.

required either an award of sole custody to Wife or joint custody. In support of this argument, she pointed out that Dr. Kennedy's report stated that Wife's ability to stay in the United States was one of the important deciding factors. Since Wife has lawful permanent residence, she argued that this factor cuts in her favor. Wife also contended that Dr. Kennedy did not know Wife's immigration status, and instead "was sure" that Wife was illegally present in the United States and would soon leave. This conclusion was allegedly without a basis in fact and was prejudicial to Wife.

According to Wife, Dr. Kennedy reached conclusions without knowledge or investigation into the underlying facts. Specifically, Wife argued that Dr. Kennedy did not include Wife's concerns about Husband's alcohol use in the custody report. In addition, Wife contended that Dr. Kennedy's report should have addressed the vulnerabilities of female immigrant spouses. Dr. Kennedy's report also did not include the notes from her interview with S.A. or with J.D. Dr. Kennedy did not interview D.D., who lived in Texas, though Wife had asked Dr. Kennedy to do so.

With respect to the PMA, Wife asserted that Husband alone arranged the marriage ceremony, and the PMA was notarized an hour before the ceremony. Wife did not read or understand the PMA because English was not her native language, nor was she

informed that she should have her own attorney review the agreement. Instead, Husband allegedly told Wife he would send her back to Vietnam if she did not sign the PMA. Wife argued that the facts showed that she signed the PMA involuntarily; the family court thus should not have found that it was enforceable. In support of her contention, Wife cited cases from other jurisdictions in which courts found PMAs signed under similar circumstances unenforceable.

Wife alleged that when she and the child returned from Texas, Husband lied and misused the TRO process to remove the minor child from Wife's care.

### 2. Husband's Answering Brief

With respect to the PMA, Husband asserted that he gave Wife a copy of the agreement two weeks before she signed it, along with $300 to pay a lawyer to review it. Wife allegedly said that she didn't need a lawyer's opinion and asked Husband to make one change to the agreement to "contribute his premarital equity to any joint properties the parties were to purchase," which Husband did. Husband maintained that Wife was fluent in English and communicated with her attorney and with Husband in English.

### 3. Wife's Reply Brief

Wife argued that Husband's AB ignored the mistakes and bias of the custody evaluator and failed to respond to Wife's

arguments that Husband abused the TRO process.

**4.    The ICA's Memorandum Opinion**

The ICA concluded that each challenged FOF relating to child custody was supported by substantial evidence in the record, and that the circuit court properly considered the relevant factors set forth in HRS § 571-46 (2018)[10] to determine

---

[10]    HRS § 571-46 (2018) states in relevant part:

> (a) In actions for divorce . . . where there is at issue a dispute as to the custody of a minor child, the court . . . may make an order for the custody of the minor child as may seem necessary or proper.  In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:
>
>> (1)    Custody should be awarded to either parent or to both parents according to the best interests of the child, and the court also may consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child;
>
> . . . .
>
>> (4)    Whenever good cause appears therefor, the court may require an investigation and report concerning the care, welfare, and custody of any minor child of the parties.  When so directed by the court, investigators or professional personnel attached to or assisting the court, hereinafter referred to as child custody evaluators, shall make investigations and reports that shall be made available to all interested parties and counsel before hearing, and the reports may be received in evidence[.]
>
> . . . .
>
> (b) In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:
>
> . . . .

(continued . . .)

25

the best interest of the minor child.  The ICA quoted FOFs 39-52,[11] concluding that those FOFs supported the family court's

---

  (2) Any history of neglect or emotional abuse of a child by a parent;

  (3) The overall quality of the parent-child relationship;

  (4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;

 . . . .

  (6) The physical health needs of the child;

  (7) The emotional needs of the child;

  (8) The safety needs of the child;

  (9) The educational needs of the child;

  (10) The child's need for relationships with siblings;

 . . . .

  (12) Each parent's actions demonstrating that they separate the child's needs from the parent's needs;

 . . . .

  (15) The areas and levels of conflict present within the family[.]

[11] These FOFs are as follows:

  39. On or about October 16, 2017, the Honorable Dyan M. Medeiros ordered that Reneau Kennedy, Ed.D. serve a[s] custody evaluator in this case.

  40. Dr. Kennedy engaged in a comprehensive investigation and provided a 112-page report which was filed on July 27, 2018[,] and received into evidence as Plaintiff's Exhibit "6".

  41. Dr. Kennedy also provided testimony and was subject to cross-examination during the trial.

(continued . . .)

decision to award Husband sole physical custody of the minor child.

With respect to the PMA, the ICA again quoted the family court's FOFs and concluded that "[t]he family court's

42. Dr. Kennedy provided her findings and recommendations in her report and also testified to the same.

43. The Court found Dr. Kennedy's report and testimony credible and persuasive. Notwithstanding however, approximately six (6) months elapsed between the filing of the report and the completion of trial.

44. Dr. Kennedy identified that the child had developmental delays in several areas and that the Department of Health Services provided support and services to the child which helped to compensate for said delays.

45. Father took a pro-active approach with respect to the child's education and Mother did not.

46. After some time, however, it appears that Mother became more supportive of the child's educational needs.

47. Although initially, Mother frequently took the child to school late or failed to take the child to school, it appeared to the Court that Mother addressed the issue.

48. Although domestic violence between the parties were alleged by both sides, Dr. Kennedy through her extensive investigation, believed that Father's accounts were [] more credible and the Court agreed with the same.

49. There was no credible evidence that either party was a danger to the child or neglected the child.

50. It appeared to the Court that both parties had a strong and healthy relationship with the child.

51. Based on the credible and reliable evidence adduced at trial, the Court found that it is in the child's best interests that Mother and Father share joint legal custody except for educational decisions.

52. Based on the credible and reliable evidence adduced at trial, the Court found that it is in the best interests of the child that Father be awarded sole physical custody of the child subject to the liberal visitation set forth in the Decision and Order.

conclusions of law are supported by the family court's [FOFs] and reflect an application of the correct rule of law."

C.    Supreme Court Proceedings

Wife presented three points of error in her application for the writ of certiorari, which we construe as follows:

> I. The family court erred in finding that the PMA was enforceable in spite of evidence that Wife signed it involuntarily.
>
> II. The family court erred in relying on the Custody Evaluator's biased report recommending awarding Husband sole custody of the minor child.
>
> III. The family court erred in failing to find that Husband abused the TRO process in order to gain an advantage in a custody dispute.

Wife's contentions in her certiorari application regarding the PMA's execution are the same as those in her opening brief.  As to Dr. Kennedy's bias, Wife's application cites the following instances of alleged unfairness in the report: (1) the opinion that Wife's immigration status was an important factor in determining the best interests of the child and the statement that Wife was subject to deportation; (2) the absence of notes from the custody evaluator's interviews with S.A. and J.D.; (3) the custody evaluator's belief that the child was only with Wife on the weekends; (4) the custody evaluator's need to refresh her recollection on the stand by reading her report in order to answer Wife's counsel's questions about Wife's "concerns" about Husband; (5) the absence of analysis of

Husband's alleged misuse of the TRO process; (6) the absence of questions to Husband about his alcohol use; and (7) the custody evaluator's failure to interview D.D. As to her third point of error, Wife repeats her opening brief's arguments.

Husband did not file a response.

## III. STANDARDS OF REVIEW

### A. Construction of a Contract

In Balogh v. Balogh, 134 Hawai'i 29, 332 P.3d 631 (2014), we stated:

> The construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court. Unconscionability is a question of law this court reviews de novo. Whether particular circumstances are sufficient to constitute duress is a question of law, although the existence of those circumstances is a question of fact.

Id. at 37-38, 332 P.3d at 639-40 (quotation marks, elipsis, brackets and citations omitted).

### B. Family Court's FOFs

We have held:

> The family court's FOFs are reviewed on appeal under the clearly erroneous standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (quotation marks, ellipsis and citations omitted).

A mixed question of law and fact is likewise reviewed under the clearly erroneous standard. Id.

## C. Family Court's COLs

"[T]he family court's COLs are reviewed on appeal de novo[.]" Id.

### IV. DISCUSSION

## A. The Family Court Did Not Err in Finding that the PMA was Enforceable

A PMA is enforceable unless (1) execution of the agreement was involuntary, or (2) the agreement was unconscionable when executed, and "before execution of the agreement," the party against whom enforcement is sought:

> (A) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>
> (B) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>
> (C) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

HRS § 572D-6(a).

Wife's primary argument is that she did not enter into the PMA voluntarily. Nonetheless, we discuss both involuntariness and unconscionability below because her brief could be construed to raise unconscionability as well.

### 1. The family court did not clearly err in its factual findings that Wife voluntarily entered into the PMA

Given the conflicting testimony on the circumstances under which the parties executed the PMA, there was substantial evidence in the record to support the family court's

30

determination that Wife did not prove that she involuntarily entered into the agreement. In other words, the family court, judging the demeanor and credibility of the witnesses, found Husband credible, and Husband's testimony supports the trial court's ultimate conclusion on the question of voluntariness. Thus, we are not left with a "definite and firm conviction" that the family court made a mistake.

2. **The family court's factual findings supported its conclusion of law that Wife did not involuntarily execute the PMA**

This court has not considered voluntariness in the context of a PMA. However, the ICA did so in Chen v. Hoeflinger, 127 Hawai'i 346, 357, 279 P.3d 11, 22 (App. 2012), in which the ICA stated, "Involuntariness is shown by evidence of duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness." (Quotation marks omitted.) See Balogh, 134 Hawai'i at 49, 332 P.3d at 651 (applying the ICA's formulation of involuntariness in Chen to the question of enforceability of a post-marital agreement). Given the substantial evidence supporting the family court's factual findings, its conclusion of law that Wife did not prove she involuntarily signed the PMA was not erroneous under the principles articulated in Chen. Nevertheless, we take the opportunity to provide more specific guidance for family courts to use in determining whether a PMA was involuntarily entered

31

into.  We find the factors set forth in In re Bonds, 5 P.3d 815 (Cal. 2000), compelling, and we adopt those factors under the laws of our state.

In Bonds, the California Supreme Court upheld a PMA between Husband (baseball player Barry Bonds) and Wife, a Swedish citizen whose first language was not English.  The agreement was signed the day before the wedding, and Wife testified that she did not know until she arrived at Husband's lawyer's office that she was there to execute a PMA.  Id. at 818.  The court held that "[i]n determining the voluntariness of a premarital agreement, a reviewing court should accept such factual determinations of the trial court as are supported by substantial evidence."  Id. at 834.  Because there was substantial evidence to support the trial court's findings that (1) Wife was not subject to any threats and did not express reluctance to sign the agreement, (2) the close proximity to the wedding was not coercive, and (3) the wedding could have been postponed, the court found the PMA enforceable.  Id. at 835.

Bonds set forth the following guidance:[12]

> In considering defenses proffered against enforcement of a
> premarital agreement, the court should consider whether the

---

[12]    Although the Bonds factors were adopted in the context of a PMA in which one spouse was in the United States on a 90-day visa, California courts have used the factors to determine the voluntariness of PMAs outside of this specific immigration context, as well.  See, e.g., In re Marriage of Hill & Dittmer, 202 Cal. App. 4th 1046 (2011).  Likewise, going forward, courts should consider these factors in all cases where the voluntariness of a PMA is disputed, regardless of whether a party contends that immigration concerns contributed to the alleged involuntariness of the agreement.

> evidence indicates coercion or lack of knowledge . . . .
> Specifically, the cases cited in the comment to the
> enforcement provision of the Uniform Act direct
> consideration of the impact upon the parties of such
> factors as the coercion that may arise from the proximity
> of execution of the agreement to the wedding, or from
> surprise in the presentation of the agreement; the presence
> or absence of independent counsel or of an opportunity to
> consult independent counsel; inequality of bargaining power
> – in some cases indicated by the relative age and
> sophistication of the parties; whether there was full
> disclosure of assets; and the parties' understanding of the
> rights being waived under the agreement or at least their
> awareness of the intent of the agreement.

5 P.3d at 824-25.

The Nebraska Supreme Court adopted this language in

Mamot v. Mamot, 813 N.W.2d 440 (Neb. 2012), as have several

other state courts. E.g., In re Marriage of Rudder, 217 P.3d

183, 191 (Or. Ct. App. 2009); Chaplain v. Chaplain, No. 1301-10-

1, 2011 WL 134104, at *4 (Va. Ct. App. 2011). California,

Nebraska, and Oregon, like Hawai'i, have adopted the Uniform

Premarital Agreement Act. See Uniform Law Commission,

"Premarital Agreement Act" (1983), https://perma.cc/KW87-

R3Z4?type=image. The factors set forth in Bonds illustrate

practical concerns regarding voluntariness and give trial courts

ample guidance on this important issue.

Based on the family court's FOFs, Wife does not

satisfy the Bonds test for unenforceability. Although the PMA

was executed the same day as the parties married, the family

court found that the marriage took place that day at Wife's

request, Husband provided a copy of the PMA to Wife a few weeks

prior, Husband edited a provision of the PMA in response to Wife's concerns to make it more favorable to her, and Wife understood the intent of the PMA.  In addition, there was no evidence that Husband failed to disclose any of his assets.  Thus, four out of five of the Bonds factors – surprise in the presentation of the agreement, bargaining power, full disclosure of assets, and awareness of the intent of the agreement - weigh in favor of Husband.  As to the fifth Bonds factor, opportunity to consult independent counsel, Husband testified that he provided Wife with time and money to hire a lawyer, but she declined to do so.  The family court did not enter a specific finding of fact on this issue, but the family court judged Husband generally credible.  Thus, the family court's and ICA's decision on the PMA's voluntariness was correct.

    **3.    The PMA was not unconscionable**

    An unconscionable PMA is unenforceable.

> Unconscionability encompasses two principles: one-sidedness and unfair surprise.  One-sidedness (i.e., substantive unconscionability) means that the agreement leaves a post-divorce economic situation that is unjustly disproportionate.  Unfair surprise (i.e., procedural unconscionability) means that one party did not have full and adequate knowledge of the other party's financial condition when the marital agreement was executed.

Balogh, 134 Hawai'i at 41, 332 P.3d at 643 (quotation marks, citations and brackets omitted).

    HRS § 572D-6(a)(2) requires that a party prove both substantive and procedural unconscionability in order to avoid

enforcement of a PMA. Here, the PMA was neither substantively nor procedurally unconscionable.

As to substantive unconscionability, it appears that the agreement was not "unjustly disproportionate." The agreement preserved for each party the assets and liabilities with which they entered the marriage and provided that any assets or liabilities acquired during the marriage would be joint property, and it released both parties from alimony or support obligations.[13] These terms do not rise to the level of substantive unconscionability. The applicable statute specifically permits PMAs providing for "modification or elimination of spousal support," and "disposition of property upon . . . marital dissolution." HRS § 572D-3(a)(3)-(4). Moreover, Wife has not established that, based on the statutory factors in HRS § 580-47 (2018),[14] she would have been awarded

---

[13] The agreement also provided that, if the parties were still married at the time of Husband's death, Wife would receive 100% of Husband's Thrift Savings Plan benefit and life insurance policies, so long as all of Husband's dependent children were over age 22. If any dependent children were under age 22 at the time of Husband's death, the benefit would be split between Wife and the children in equal shares. Further, the agreement expresses Husband's intent to will "all previously acquired real estate and future real estate acquired jointly to the Wife at time of his death."

[14] HRS § 580-47 states in relevant part:

> In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:
>
> (1) Financial resources of the parties;

(continued . . .)

spousal support absent the PMA.

As to procedural unconscionability, crediting Husband's account of events as the family court did, the PMA was not procedurally unconscionable. According to the testimony that the family court found credible, Wife had the opportunity to review the PMA, have independent counsel review it (though she chose not to), and negotiate with Husband for more favorable terms. There is no evidence that the family court found

---

(2) Ability of the party seeking support and maintenance to meet his or her needs independently;

(3) Duration of the marriage;

(4) Standard of living established during the marriage;

(5) Age of the parties;

(6) Physical and emotional condition of the parties;

(7) Usual occupation of the parties during the marriage;

(8) Vocational skills and employability of the party seeking support and maintenance;

(9) Needs of the parties;

(10) Custodial and child support responsibilities;

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13) Probable duration of the need of the party seeking support and maintenance.

credible that would indicate Wife did not have full knowledge – or the chance to obtain full knowledge – of Husband's financial situation.  Schedule A1, attached to the PMA, lists Husband's assets, and Wife has not argued that the list is incomplete.  Hence, the PMA was not unconscionable.

**B.    The Family Court Did Not Err by Considering the Custody Evaluator's Report**

Pursuant to HRS § 571-46(4), custody evaluators' reports "may be received in evidence if no objection is made and, if objection is made, may be received in evidence; provided the person or persons responsible for the report are available for cross-examination[.]"  A custody evaluator's expert opinion is treated as evidence, and the family court as factfinder is permitted to assign weight to that opinion based on its credibility assessment.  See Fisher v. Fisher, 111 Hawai'i 41, 50-51, 137 P.3d 355, 364-65 (2006) ("Inasmuch as the family court accorded weight to certain witnesses over others and those witnesses [including the custody evaluator] provided evidence that the relocation would benefit the children, the ICA did not err in upholding the family court's findings and conclusions regarding the best interests of the children."); see also In re Doe, 95 Hawai'i 183, 197, 20 P.3d 616, 630 (2001); cf. D.J. v. C.J., 147 Hawai'i 2, 22, 464 P.3d 790, 810 (2020) (arguing that the family court erred in considering a custody evaluator's

report that omitted arguably relevant information went to the report's weight, not its admissibility).

Counsel for Wife cross-examined Dr. Kennedy with respect to each of the inconsistencies and errors Wife raises in her certiorari application. S.A. and J.D., the two people whose interviews were omitted from Dr. Kennedy's report, testified at trial as to what they told Dr. Kennedy during their interviews. Thus, the family court was able to appropriately consider Dr. Kennedy's credibility and the probative value of the report.

## C.  The Family Court Did Not Err by Failing to Find that Husband Abused the TRO Process to Gain an Advantage in a Custody Dispute

"A parent's prior [willful] misuse of the protection from abuse process under chapter 586 to gain a tactical advantage in any proceeding involving the custody determination of a minor" is one of the factors that the family court must consider in determining the best interests of a child. HRS § 571-46(b)(16). Further:

> Such [willful] misuse may be considered only if it is
> established by clear and convincing evidence, and if it is
> further found by clear and convincing evidence that in the
> particular family circumstance the [willful] misuse tends
> to show that, in the future, the parent who engaged in the
> [willful] misuse will not be able to cooperate successfully
> with the other parent in their shared responsibilities for
> the child.

HRS § 571-46(b)(16).

Husband obtained a TRO against Wife on behalf of the minor child, although his petition did not list any instances of

abuse against the minor child. The child was removed from the scope of the TRO at the first hearing on the matter, on November 2, 2016, to allow Wife visitation with the child. Wife relied on these facts, along with her contention that Husband lied about the instances of abuse he listed on the TRO application, to argue that Husband misused the TRO process to gain a tactical advantage.

This evidence fails to "clear[ly] and convincing[ly]" show (1) a willful misuse of the TRO process or (2) that the misuse gave Husband any tactical advantage in the custody dispute. Further, there was no evidence regarding the TRO that showed Husband could not cooperate with Wife in the future. Wife's third point of error is thus meritless.

## V. CONCLUSION

For the foregoing reasons, we affirm the ICA's March 4, 2020 Judgment on Appeal pursuant to its February 6, 2020 Memorandum Opinion affirming the Decree Granting Absolute Divorce and Awarding Child Custody entered by the Family Court of the First Circuit on May 20, 2019.

| | |
|---|---|
| Michael A. Glenn<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Scot Stuart Brower<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| | /s/ Gary W.B. Chang |

