**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000365
30-DEC-2020
08:40 AM
Dkt. 143 MO**

NO. CAAP-16-0000365

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


JOE CROFFORD, Plaintiff-Appellee/Cross-Appellant,
v.
KRISTI ADACHI, Defendant-Appellant/Cross-Appellee


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-D NO. 13-1-7625)


MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Hiraoka, and Nakasone, JJ.)

Defendant-Appellant/Cross-Appellee Kristi Adachi
(**Adachi**) appeals from the "Decree Granting Absolute Divorce and
Awarding Child Custody" (**Divorce Decree**), entered on April 26,
2016, by the Family Court of the First Circuit (**family court**).[1]
On appeal, Adachi contends that the family court erred in its
Divorce Decree by refusing to enforce a "Marital Agreement" and a
"Marital Agreement Addendum" (**Addendum**) executed between Adachi
and Plaintiff-Appellee/Cross-Appellant Joe Crofford (**Crofford**)
during their marriage and prior to the divorce proceedings.  The
Marital Agreement and Addendum address the division of property
between the parties in the event of divorce.

On cross-appeal, Crofford contends that the family
court abused its discretion in entering its "Order and Judgment
Regarding Defendant's Expenses Incurred responding to Plaintiff's

---

[1]  The Honorable Darryl Y.C. Choy presided over the Divorce Decree.

Motion to Reconsider Order of April 15, 2015, filed on April 21, 2015 and Motion for Allowance of Interlocutory Appeal filed on April 21, 2015" (**Order Assessing Attorney's Fees**), which ordered Crofford to pay $3,560.21 in legal expenses incurred by Adachi in responding to two motions filed by Crofford.  Crofford also apparently challenges a number of the family court's findings of fact and conclusions of law (**FOFs/COLs**) set out in the Divorce Decree.  However, as further discussed below, we disregard Crofford's points of error pertaining to the family court's FOFs/COLs because he fails to provide discernable argument addressing these contentions in his opening brief.  Thus, we only address Crofford's point of error pertaining to the Order Assessing Attorney's fees.

For the reasons discussed below, we vacate the family court's Divorce Decree with respect to the property division between the parties.  We affirm the Order Assessing Attorney's Fees against Crofford.

## I.  Background

Adachi and Crofford were married on July 24, 1999.  The parties did not execute a pre-nuptial agreement prior to their marriage.  Later in their marriage, Adachi indicated to Crofford that she wanted to file for divorce after discovering that he had engaged in extramarital affairs during their relationship.  Crofford, however, pleaded with Adachi not to leave the marriage and instead proposed that the parties sign a post-nuptial agreement.  Adachi agreed, and in March 2013, she consulted with her legal counsel about drafting a Marital Agreement.

Adachi's counsel prepared at least two drafts of a Marital Agreement.  Both drafts addressed, *inter alia*, the division and distribution of certain property in the event of a divorce, and included two schedules which listed the separately owned property and debts of Adachi or her revocable trust, and the separately owned property and debts of Crofford.  Crofford apparently refused to sign the first proposed version of the

2

Marital Agreement and did not make any edits or proposed revisions to it.

A second version of the Marital Agreement was presented to Crofford that, *inter alia*, set forth their separate property, upon which he made hand-written edits to portions of the agreement and the attached schedules.  This version of the Marital Agreement was initialed by Adachi, but neither party executed the document.  Instead, the parties apparently drafted an Addendum to address issues that were lined or struck out by Crofford in the second version of the Marital Agreement.  The Addendum was primarily drafted by Crofford, but both parties had an opportunity to review and revise the document before agreeing to it.

In the Addendum, Crofford made statements about his failures in the marriage, and his commitment to making the marriage work.  The Addendum further states:

> I ask my wife for forgiveness for all my sins and will uphold my verbal, and now written promise to her regarding agreeing to leave this marriage with honor and dignity without monetary compensation if I an [sic] unable the [sic] change my sinful ways.  Specifically, have another affair; either emotional or consummated, or physically harm Kristi.

The Addendum then addresses the allocation of certain property in the event that Crofford was either unfaithful or physically abusive to Adachi.[2]  In its conclusion, the Addendum states:

---

[2]  The portion of the Addendum which addresses specific property provides, in relevant part:

> The Sunreef 62 foot Catamaran Yacht with the Coast Registered name Spartan Queen will remain the property [of] Joe Crofford and will be put in Joe Crofford's trust with Kristi Adachi named as the beneficiary in the event of Joe Crofford's Death and will remain the property of the trust in the event of a divorce with exception in the case of infidelity and physical harm by Joe Crofford.  At which time the Ownership of the Yacht Spartan Queen will be transferred to Kristi Adachi.

> The Penthouse 4501 located at One Waterfront Towers 415 South St. will remain in Kristi Adachi's Trust with Joe Crofford named as the Beneficiary.

> In the event of divorce with the exception of infidelity or

(continued...)

"[t]his is my Addendum to the Marital agreement to be upheld and considered a part of the legal document."  Adachi and Crofford executed the Addendum in the presence of a notary public on June 24, 2013, and June 25, 2013, respectively.

In September 2013, the parties separated after Crofford exhibited aggressive behavior towards Adachi, dragging her down the stairs of their apartment.  Crofford thereafter left the residence and began staying on the catamaran yacht named Spartan Queen, which was listed in the Addendum, Schedule B as Crofford's separate property.

On October 7, 2013, Crofford filed a complaint for divorce against Adachi alleging that their marriage was irretrievably broken.  On September 4, 2014, Adachi filed a motion for partial summary judgment seeking to enforce the Marital Agreement and Addendum that she asserted were voluntarily entered into by both parties and controlled the division and distribution of the couple's property.  On October 29, 2014, the

---

[2](...continued)
physical harm by Joe Crofford, Joe Crofford will maintain ownership of the Spartan Queen, which has been effectively paid in full by Kristi. All monies invested in the yacht up until November 2012 were contributions directly from money earned through Kristi's business: Hawaiian Island ENT Specialists (see attachment) and will be considered monetary compensation for the years invested in this Marriage. I will waive any separation of property rights; except as described below and alimony.

All future income earned by Kristi with regards to her private business; including Hawaiian Island ENT Specialists, Scottrade account and any other future personal business ventures will remain hers. All income earned by Joe through his LED business, Hawaiian Island Luxury Yacht Charters, Scottrade account and any other future business ventures will be his.

We will also both have to agree on all future financial decisions to secure our financial future together.  I accept her proposal to place the proceeds from the sale of apartment 425 South Street in a Trust under both of our names.  This money will represent the beginning of "Chapter II" of our relationship.  In the event of a divorce, any monies gained or properties invested in will be split equally between the two of us; with the exception of infidelity and physical harm.

(Emphases added).

family court denied Adachi's motion for partial summary judgment, without prejudice, stating in the written order that "because factual issues need to be determined to rule on this motion, the Court finds that said motion is not properly set for summary judgment." The case eventually proceeded to trial on January 11, 12, 19, and 26, 2016, where the parties continued to contest whether the Marital Agreement and Addendum should be enforced.

On April 26, 2016, the family court entered its Divorce Decree, in which it did not enforce the Marital Agreement and Addendum in dividing the marital property. On August 1, 2016, the family court entered its FOFs/COLs and made, *inter alia*, numerous findings and conclusions pertaining to the Marital Agreement and Addendum. The family court concluded that "the Marital Agreement was agreed to with Husband's notations lined out and subsequently [being] referred to in a signed addendum." The family court also found that Adachi had never coerced or unduly influenced Crofford to sign the Addendum, nor was he under duress when he signed the document. The family court further concluded that Crofford violated the infidelity conditions in the Addendum.

However, the family court ultimately rejected the Marital Agreement (and apparently the Addendum), concluding as follows:

> 8. The Court rejects the Marital Agreement, however, because the essence of the Marital Agreement violates the statutory policy and principles of no fault divorce and equitable distribution.
>
> 9. H.R.S. §580-47 gives to the family court the discretion to divide marital property according to what is just and equitable. When the directive to the court is to do what is just and equitable in the circumstances, each case must be decided upon its own facts and circumstances. Gussin v. Gussin, 73 Haw. 470 (1992).

The family court then divided the marital property as set forth in its Divorce Decree and the FOFs/COLs, based on what the family court determined would be just and equitable, and without enforcing the Marital Agreement and Addendum.

## II.  Standards of Review

### A.  The Family Court's Decisions

"Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion".  Kakinami v. Kakinami, 127 Hawaiʻi 126, 136, 276 P.3d 695, 705 (2012) (citations omitted).

### B.  Award of Attorney's Fees

The family court's award of attorney's fees and costs is reviewed for abuse of discretion.  Hamilton v. Hamilton, 138 Hawaiʻi 185, 210, 378 P.3d 901, 926 (2016).  The Hawaiʻi Supreme Court has explained that "an award of attorney's fees is in the sound discretion of the trial court, limited only by the standard that it be fair and reasonable."  Id. at 209, 378 P.3d at 925 (quoting Farias v. Farias, 58 Haw. 227, 233, 556 P.2d 1104, 1109 (1977)).

### C.  The Family Court's Findings of Fact and Conclusions of Law

> The family court's findings of fact are reviewed under the clearly erroneous standard.  A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.  Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.  The family court's conclusions of law are reviewed *de novo*.

Balogh v. Balogh, 134 Hawaiʻi 29, 38, 332 P.3d 631, 640 (2014) (citations and internal quotation marks omitted).

## III.  Discussion

### A.  Adachi's Appeal

On appeal, Adachi asserts that the family court erred in refusing to enforce the Marital Agreement and Addendum because: (1) the court was statutorily required to enforce the Marital Agreement and the Addendum; (2) the Marital Agreement and Addendum were valid contracts, and not otherwise unenforceable; (3) the family court was not authorized to refuse to enforce the Marital Agreement and Addendum and instead undertake its own

"just and equitable" division of the marital estate; (4) Hawaii's no-fault divorce standards do not preclude enforcement of the Marital Agreement and the Addendum; and (5) Crofford voluntarily entered into the post-marital contract and it was not unconscionable.

### 1.    HRS § 572-22 and Hawaiʻi Case Law

When the parties signed the Addendum, in 2013, HRS § 572-22(2013) provided, in relevant part:

> **§572-22  Contracts**. A married person may make contracts, oral and written, sealed and unsealed, with her or his spouse, or any other person, in the same manner as if she or he were sole.
>
> . . .
>
> All contracts made between spouses, whenever made, whether before or after June 6, 1987, and not otherwise invalid because of any other law, shall be valid.[3]

(Footnote added).

The Hawaiʻi Supreme Court has recognized the right of married persons to enter enforceable contracts related to marital

---

[3]  In 2019, HRS § 572-22 was amended to make apparently non-substantive and reformatting amendments, and now reads in whole:

> (a) A married person may make contracts, oral and written, sealed and unsealed, with the married person's spouse, or any other person, in the same manner as if the married person were sole.
>
> (b) An agreement between spouses providing for periodic payments for the support and maintenance of one spouse by the other, or for the support, maintenance, and education of children of the parties, when the agreement is made in contemplation of divorce or judicial separation, is valid; provided that:
>
> (1) The agreement shall be subject to approval by the court in any subsequent proceeding for divorce or judicial separation; and
>
> (2) Future payments under an approved agreement shall nevertheless be subject to increase, decrease, or termination from time to time upon application and a showing of circumstances justifying a modification thereof.
>
> (c) All contracts made between spouses, whenever made, whether before or after June 6, 1987, and not otherwise invalid because of any other law, shall be valid.

See 2019 Haw. Sess. Laws Act 111, §40 at 420-21.

property rights, stating:

> Spouses may contract regarding marital property rights in premarital, postmarital, or settlement agreements. Premarital or prenuptial agreements are entered into before marriage. <u>See, e.g.,</u> <u>Prell v. Silverstein</u>, 114 Hawai'i 286, 287–88, 162 P.3d 2, 3–4 (App.2007). Postmarital or postnuptial agreements are entered into after marriage. <u>See, e.g.,</u> <u>Chen v. Hoeflinger</u>, 127 Hawai'i 346, 352, 279 P.3d 11, 17 (App.2012). Settlement agreements are entered into after separation or in anticipation of immediate separation. <u>See, e.g.,</u> <u>Bienvenue v. Bienvenue</u>, 102 Hawai'i 59, 61, 72 P.3d 531, 533 (App.2003).

<u>Balogh</u>, 134 Hawai'i at 39 n.4, 332 P.3d at 641 n.4. The supreme court has further expressly addressed postmarital agreements and succinctly held:

> the family court must enforce all <u>valid and enforceable</u> postmarital and separation agreements. A postmarital or separation agreement is <u>enforceable</u> if the agreement is <u>not unconscionable</u> and has been <u>voluntarily entered into</u> by the parties with the knowledge of the financial situation of the other spouse.

<u>Id.</u> at 40, 332 P.3d at 642 (emphasis added) (citations, brackets, and quotation marks omitted).

Although the family court has certain authority under HRS § 580-47(a) (2018) to "make any further orders as shall appear just and equitable" in dividing and distributing the estate of the parties, such authority does not take precedence over the parties' right to enforce their valid and enforceable marital agreements. <u>See</u> <u>Epp v. Epp</u>, 80 Hawai'i 79, 84, 905 P.2d 54, 59 (App. 1995). Absent a finding that the Marital Agreement and Addendum were either invalid or unenforceable, the family court could not invoke its authority under HRS § 580-47(a) to divide Adachi and Crofford's marital estate contrary to their agreements. <u>See</u> <u>id.</u>; <u>see also</u> <u>Balogh</u>, 134 Hawai'i at 40, 332 P.3d at 642.

Here, the family court rejected the Marital Agreement and Addendum on the basis that "the essence" of the agreement "violate[d] the statutory policy and principles of no fault divorce and equitable distribution." The family court did not expressly elaborate as to what part of the Marital Agreement or

8

Addendum it determined had violated such policy or principles, nor did it cite any legal authority for its ruling.  It appears, based on the record, the family court concluded that the terms of the Addendum conditioning distribution of certain marital property on Crofford's fidelity in the marriage violates Hawaii's public policy favoring no-fault divorce.  We hold that voiding the Marital Agreement and Addendum on this basis was error.

As previously stated, under HRS § 572-22, "[a]ll contracts made between spouses, whenever made . . . and not otherwise invalid because of any other law, shall be valid." Although Hawaiʻi has implemented a no-fault divorce scheme, there is no law that invalidates a marital agreement because it provides for the distribution of marital property based on the conduct of the parties.  Rather, given the explicit provisions of HRS § 572-22, and as recognized by the supreme court, spouses may contract regarding marital property rights in premarital, postmarital, or settlement agreements, and the family court must enforce all valid and enforceable agreements with regard to marital property division.  Balogh, 134 Hawaiʻi at 39 n.4, 40, 332 P.3d at 641 n.4, 642.

We have held that one spouse's personal conduct or misconduct towards the other spouse is irrelevant to a family court's division of marital property under HRS § 580-47.  See Markham v. Markham, 80 Hawaiʻi 274, 280, 909 P.2d 602, 608 (App. 1996); Horst v. Horst, 1 Haw. App. 617, 624, 623 P.2d 1265, 1270-71 (1981) (holding "[f]ault pertaining to personal conduct of the spouses toward each other has no bearing on the question as to which spouse has a better claim to the property sought to be divided in a divorce proceeding" (citation omitted)).  However, those cases are distinguishable because they did not reject a marital agreement freely entered into by the parties.

**2.  Case Law From Other Jurisdictions**

Crofford asserts that the terms of the Addendum that condition distribution of certain marital property on Crofford's fidelity in the marriage violates Hawaii's public policy favoring

no-fault divorce.  Crofford cites to cases from other jurisdictions that have held similar agreements conditioned on a spouse's fidelity unenforceable or void as a matter of public policy under no-fault divorce laws.  See In re Marriage of Cooper, 769 N.W.2d 582, 585-586 (Iowa 2009); Diosdado v. Diosdado, 97 Cal.App.4th 470, 473-75 (Cal. Ct. App. 2002).  However, it does not appear that those jurisdictions have statutes similar to HRS § 572-22.

In the Iowa case, In re Marriage of Cooper, the parties to a divorce proceeding entered into a reconciliation agreement after the wife had discovered her husband was having an affair.  The reconciliation agreement required husband to make specified payments and provide for certain financial arrangements "[i]n the event of a permanent breakdown in the marital relationship."  769 N.W.2d at 584.  In ruling that the reconciliation agreement was void, the Iowa Supreme Court began its discussion by noting that "[t]here is no provision of Iowa statutory law that expressly authorizes or prohibits enforcement of reconciliation agreements between spouses."  Id. at 585.  The court thus relied on its case law in the area.  In re Marriage of Cooper is thus distinguishable.

In Diosdado, after the husband had an affair, the parties entered an agreement providing that if either were not faithful and either party chose to terminate the marriage, certain damages would be owed by the unfaithful party, including "liquidated damages" of $50,000.  97 Cal.App.4th at 472-73.  The court in Diosdado upheld the lower court's ruling that the agreement was contrary to public policy under California's no-fault divorce laws.  97 Cal.App.4th at 473.  However, the court relied on California statutory provisions as follows:

> To be enforceable, a contract must have a "lawful object."
> (Civ. Code, § 1550, subd. 3.) A contract is unlawful if it
> is contrary to an express provision of law, contrary to the
> policy of express law, or otherwise contrary to good morals.
> (Civ. Code, § 1667.) Here, where the agreement attempts to
> impose a penalty on one of the parties as a result of that
> party's "fault" during the marriage, it is contrary to the
> public policy underlying the no-fault provisions for

> dissolution of marriage. (See Fam. Code, §§ 2310, 2335.) For
> that reason, the agreement is unenforceable.

Id. at 474. Moreover, the court cited California precedent that
recognized that:

> marriage itself is a highly regulated institution of
> undisputed social value, and there are many limitations on
> the ability of persons to contract with respect to it, or to
> vary its statutory terms, that have nothing to do with
> maximizing the satisfaction of the parties or carrying out
> their intent.... These limitations demonstrate further that
> freedom of contract with respect to marital arrangements is
> tempered with statutory requirements and case law expressing
> social policy with respect to marriage.

Id. at 475 (citation and quotation marks omitted). In short,
there does not appear to be any California statute similar to HRS
§ 572-22.

We express no opinion whether provisions similar to
those in In re Marriage of Cooper or Diosdado would be valid in
Hawaiʻi. Rather, we simply point out that those cases are not
persuasive for the proposition that the Marital Agreement and
Addendum are invalid in this case for being contrary to public
policy under Hawaii's no-fault divorce laws. Instead, we must
apply HRS § 572-22 and the applicable Hawaiʻi case law.

   3.   **The Marital Agreement and Addendum are Valid and
        Enforceable**

In light of our holding that the family court erred in
rejecting the Marital Agreement and Addendum for the court's
stated reasons, we next address whether the agreements were
enforceable. As previously stated, a family court "must enforce
all valid and enforceable postmarital and separation agreements."
Balogh, 134 Hawaiʻi at 40, 332 P.3d at 642. Here, the record
supports the family court's finding that Crofford and Adachi
signed the Addendum, as well as the family court's conclusion
that the parties entered into the Marital Agreement based on
Crofford's notations on the Marital Agreement and the Marital
Agreement being subsequently referred to in the signed Addendum.

"A postmarital or separation agreement is enforceable
if the agreement is not unconscionable and has been voluntarily

11

entered into by the parties with the knowledge of the financial situation of the [other] spouse."  Id. (citations and internal quotation marks omitted) (emphasis and brackets in original).  In determining whether a marital agreement is unconscionable, the Hawaiʻi Supreme Court has explained:

> Unconscionability encompasses two principles: one-sidedness and unfair surprise.  One-sidedness (i.e., substantive unconscionability) means that the agreement "leaves a post-divorce economic situation that is unjustly disproportionate."  Unfair surprise (i.e., procedural unconscionability) means that "one party did not have full and adequate knowledge of the other party's financial condition when the marital agreement was executed."  A contract that is merely "inequitable" is not unenforceable.  The unconscionability of an agreement regarding the division of property is evaluated at the time the agreement was executed.

Id. at 41, 332 P.3d at 643 (citations, brackets, and footnote omitted).  With regard to whether an agreement is entered into voluntarily, the supreme court stated that "[i]nvoluntariness is shown by evidence of duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness."  Id. at 43, 332 P.3d at 645 (citation and internal quotation marks omitted).

Based on the family court's FOFs/COLs, it appears the family court determined that Crofford and Adachi entered into a valid marital agreement, and that Crofford had violated the infidelity conditions in the Addendum.[4]  The family court also

---

[4]  In his answering brief, Crofford contends that the family court erred in considering the October 7, 2013 filing date of the complaint for divorce, rather than the September 8, 2013 date of separation, in determining the cut off date for applicability of the Marital Agreement and Addendum (in other words, the applicable dates for determining his infidelity).  However, Crofford asserts his "points of error" and arguments pertaining to the family court's relevant findings and conclusions on the Marital Agreement and Addendum in his answering brief.  Crofford apparently asserts these errors in his cross-appeal, but he explicitly declined to provide further argument in his opening brief.  Instead, Crofford elected to address these alleged errors in his answering brief in response to Adachi's appeal. Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(c) does not permit a party to assert its own points of error through his answering brief.
Also contra to HRAP Rule 28(b)(4), Crofford fails to state "the alleged error committed by the court," "where in the record the alleged error occurred," and "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency."

found that Crofford was neither under duress, nor was he coerced or unduly influenced by Adachi to sign the Addendum, thus indicating that the agreements were entered into voluntarily.

The family court did not address whether the Marital Agreement and Addendum were unconscionable, *i.e.*, whether there was one-sidedness and/or unfair surprise.  However, similar to <u>Balogh</u>, we reach the issue because unconscionability is a question of law reviewable *de novo*.  134 Hawai'i at 42-43, 332 P.3d at 644-45.

The Hawai'i Supreme Court has explained that:

> Generally, a determination of unconscionability ... requires a showing that the contract was both procedurally and substantively unconscionable when made, but there may be exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone.

<u>Id.</u> at 41, 332 P.3d at 643 (citations, internal quotation marks, and brackets omitted).  However, "although under Hawai'i law two basic principles are encompassed within the concept of unconscionability, one-sidedness and unfair surprise, in certain circumstances one-sidedness alone can render an agreement unconscionable.  <u>Id.</u> at 41-42, 332 P.3d at 643-44 (citing <u>Lewis v. Lewis</u>, 69 Haw. 497, 502, 748 P.2d 1362, 1366 (1988) and <u>Kuroda v. Kuroda</u>, 87 Hawai'i 419, 428, 958 P.2d 541, 550 (App. 1998) (quotation marks omitted)).

The supreme court has rejected the argument that a marital agreement should be invalidated solely on the basis that it is "somewhat one-sided."  <u>Id.</u> at 42, 332 P.3d at 644.  The supreme court further explained:

> parties may have legitimate reasons for entering into a somewhat one-sided postmarital agreement, and may do so knowingly and voluntarily. Permitting the family court to invalidate such agreements without requiring a showing of extraordinary one-sidedness would frustrate the purpose of HRS § 572-22, which permits spouses to enter into enforceable contracts with each other.

<u>Id.</u>

We further note that "[t]he unconscionability of an agreement regarding the division of property is evaluated at the

13

time the agreement was executed."  Id. at 41, 332 P.3d at 643 (citation omitted).

In his answering brief, Crofford contends that the postmarital agreement is unconscionable where Adachi would be awarded all joint assets and his only separately owned asset that had any significant value, his yacht, the Spartan Queen.[5]  The most significant item of value affected by the Marital Agreement and Addendum is the catamaran yacht.  However, the Marital Agreement and Addendum only contemplated an inequitable division of property if Crofford had another affair or physically harmed Adachi.  As the family court found, the circumstances leading to the agreements were that Crofford had engaged in extramarital affairs during their marriage, Adachi had discovered an affair and threatened to leave Crofford and file for divorce.  Crofford pleaded with Adachi not to leave the marriage, proposed that the parties sign a post-nuptial agreement.  Adachi consulted an attorney who drafted at least two drafts of a marital agreement.  Subsequently, the Addendum was drafted, primarily by Crofford, which addressed the issues that were lined or struck out by Crofford in the second version of the Marital Agreement.  It is unlikely that the Marital Agreement and Addendum would have been construed by the parties as demonstrative of Crofford's commitment to the marriage if it had not contained the contingencies of fault and the resulting inequitable distribution of property.  See Balogh, 134 Hawaiʻi at 43, 332 P.3d at 645.

We further consider the financial history between the parties, which provides context at the time they entered the Marital Agreement and Addendum.  The family court found that Crofford came into the marriage owing approximately $217,100 in

_____

[5]  The schedules attached to the Marital Agreement, before handwritten changes were made, listed Adachi's separately owned property with a total of $3,929,548.55, and Crofford's separately owned property with a total of $1,530,000 (including the catamaran yacht valued at $1,500,000).  The schedules before changes also listed joint assets totaling $53,350 and joint debt of $21,000.  The handwritten changes made by Crofford include different values for certain assets, as well as notations indicating he owned half of their gold and silver.

child support for two children from prior marriages, and this debt was paid with marital funds primarily earned by Adachi.  The family court also found that Adachi's premarital contributions were $3,050,000, while Crofford made zero premarital contributions.

In terms of their post-divorce economic situation, the family court found that both Adachi and Crofford's businesses had no value.  The family court found that Adachi had to close her practice as a surgeon after a significant medical procedure, and thus her business no longer has any value.

According to the Marital Agreement and attached schedules, except as otherwise provided in the agreement, the parties would retain their separately held property.  With regard to jointly held property, Crofford would receive the jointly titled 2012 Acura MDX ($38,250), while Adachi would receive the jointly titled American Savings Bank checking account ($6,100) and the jointly titled Australian Savings Bank checking account ($11,900) in the event of a divorce.  The handwritten changes to the schedules attached to the Martial Agreement show that Crofford claimed half of their gold and silver, originally listed as part of Adachi's separately owned assets worth $250,000 (the family court later valued the gold and silver at a total of $174,000).  Crofford also made handwritten changes to his own attached schedule and added, "7. Gold & Silver ½ of its value." Thus, under the Marital Agreement and Addendum, Crofford would at minimum receive the Acura MDX and half of the parties' gold and silver.

Under the Addendum, in the event of divorce with the exception of infidelity or physical harm, Crofford would maintain ownership of the yacht which the Addendum expressly acknowledges "has been effectively paid in full by [Adachi]."  The Addendum also states that, "[a]ll monies invested in the yacht up until November 2012 were contributions directly from money earned through [Adachi's] business...and will be considered monetary compensation for the years invested in this Marriage."  Crofford

also waived any separation of property rights except alimony and the proceeds from the sale of apartment 425 South Street, which was to be split equally between the parties, absent infidelity and physical harm.

Under the Marital Agreement and Addendum, the property division between the parties would change depending on whether Crofford had a further affair or physically harmed Adachi. Absent those conditions, he would receive much more in the event of a divorce.  Crofford primarily drafted the Addendum, which expressly noted "[t]his is my Addendum to the Marital agreement to be upheld and considered a part of the legal document."

Given Adachi's contributions to the marriage, all of the circumstances at the time the Marital Agreement and Addendum were entered into, including the reasons for drafting the agreement and the provisions therein, the one-sided distribution of property contemplated by the postmarital agreement in the event Crofford had another affair or physically harmed Adachi is not "so outrageously oppressive as to be unconscionable in the absence of unfair surprise."  Balogh, 134 Hawaiʻi at 42-43, 332 P.3d at 644-45 (holding agreement providing a 75%/25% division of marital property in favor of wife as well as $100,000 payment in lieu of alimony to wife was not unconscionable); cf., Kuroda, 87 Hawaiʻi at 428, 958, P.2d at 550 (holding postnuptial agreement is unconscionable without unfair surprise where it awards wife all personal and real property held in common, implicitly allows wife to keep her own personal property including her accounts, requires husband to pay wife one-half of his "net income from every source including retirement fund and royalties after deduction of federal, state, income, and withholding taxes" until the death of either spouse, and requires husband to pay all attorney's fees and costs of Court in connection with all divorce and separation proceedings).

Finally, the Marital Agreement and Addendum were not entered into with unfair surprise, i.e. procedurally unconscionable.  The family court found that Crofford refused to

sign the first version of the proposed Marital Agreement, which would have divided the assets such that Crofford would receive $200,000 if the parties divorced.  The family court also found Crofford struck out portions of the Marital Agreement, which based on our review of the agreement included striking provisions which would have awarded the catamaran yacht to Adachi in the event of a divorce.  The family court further found, however, that Crofford then primarily drafted the Addendum which addressed all of the issues he lined or struck out in the Marital Agreement, and that both parties had an opportunity to review and revise the Addendum before agreeing to it.  The Addendum, which Crofford primarily drafted, provides that Crofford would retain ownership of the catamaran yacht in the event of divorce "with exception in the case of infidelity and physical harm by Joe Crofford.  At which time the Ownership of the Yacht Spartan Queen will be transferred to Kristi Adachi."  Additionally, there is no evidence that Crofford did not have full knowledge or the chance to obtain full knowledge of Adachi's financial circumstances.

We therefore conclude, based on our *de novo* review, that the Marital Agreement and Addendum are not unconscionable.

**B.    Crofford's Cross-Appeal**

**1.    The family court did not abuse its discretion in entering its Order Assessing Attorney's fees**

We first address Crofford's point of error regarding the family court's Order Assessing Attorney's Fees.  The Order Assessing Attorney's Fees awarded Adachi $3,560.21 in reasonable legal expenses incurred in responding to Crofford's Motion for Reconsideration and Motion for Interlocutory Appeal.  Crofford asserts that the family court had no authority to award Adachi attorney's fees and that the order was inconsistent with the subsequent Divorce Decree entered on April 26, 2016, which specifically ordered that each party be responsible for their own attorney's fees and costs.  We disagree.

Crofford's Motion for Reconsideration and Motion for Interlocutory Appeal both consisted of only a declaration of

17

counsel that merely asserted factual allegations as to why the court should grant each motion.[6]  Neither motions contained any legal authority or argument explaining why Crofford was entitled to the relief he sought, nor addressed the legal standards required for his requested relief.

Adachi's request for attorney's fees was based on her assertion that Crofford's Motion for Reconsideration and Motion for Interlocutory Appeal had no legitimate legal basis and were not filed in accordance with the Hawaiʻi Family Court Rules.

Crofford argues the family court erred in finding that his motions were non-hearing motions.  However, based on our review of the record, it appears that a hearing was held for both motions on May 6, 2015.  In its "Order Denying [Crofford's] motion to Reconsider Order of April 15, 2015 filed on April 21, 2015 and Denying Motion for Allowance of Interlocutory Appeal filed on April 23, 2015" the family court specifically mentions the hearing on May 6, 2015 and that Crofford waived his presence but was represented by his attorney.  The family court then ordered Adachi to submit affidavits regarding the attorney's fees and costs that she incurred in responding to Crofford's motions, which was the basis of its Order Assessing Attorney's Fees.

The family court did not cite any authority in its Order Assessing Attorney's Fees.  However, based on our review of the record, it appears that the family court's order was entered based on the motions submitted by the parties and the May 6, 2015 hearing.  Crofford fails to provide the transcripts for the May 6, 2015 hearing for appellate review.  "[I]t is well established that, when an appellant desires to raise any point on appeal that requires the consideration of the oral proceedings before the court appealed from, the appellant bears the burden of showing error by reference to matters in the record, and he or she has

_____

[6]  Both the Motion For Reconsideration and Motion for Interlocutory Appeal, as well as the attached declarations of counsel were signed by Crofford's counsel.

the responsibility of providing the relevant transcript."  Ditto v. McCurdy, 103 Hawaiʻi 153, 162, 80 P.3d 974, 983 (2003).

In any event, we conclude that the Order Assessing Attorney's Fees was not inconsistent with the family court's subsequent Divorce Decree, and the family court had discretion under HRS § 580-47(a) to enter the order.[7]  The Order Assessing Attorney's Fees and Costs solely addressed the family court's award of attorney's fees incurred by Adachi in response to Crofford's Motion for Reconsideration and Motion for Interlocutory Appeal.  In contrast, the subsequently filed Divorce Decree globally addressed the allocation of attorney's fees and costs incurred in the divorce proceedings.  Although the Divorce Decree does not reference or incorporate the Order Assessing Attorney's Fees, it cannot be said that such omission by itself invalidates the previously entered order.

On July 11, 2016, Adachi filed a Motion for Enforcement of Court Ordered Payments.  On August 16, 2016, after a July 12, 2016 hearing, the family court ordered Crofford to make payments pursuant to the Order Assessing Attorney's Fees and ordered additional payment of attorney's fees and costs incurred for Adachi's motion for enforcement.  Crofford fails to provide the transcripts for the July 12, 2016 hearing for appellate review.

Based on the foregoing, we affirm the family court's Order Assessing Attorney's fees.

## 2.  Crofford's other points of error

In his points of error, Crofford further lists numerous findings of fact and conclusions of law that he apparently challenges.  However, Crofford's purported points of error pertaining to the family court's FOFs/COLs fail to state "the alleged error committed by the court", "where in the record the alleged error occurred," and "where in the record the alleged error was objected to or the manner in which the alleged error

---

[7]  HRS § 580-47(a) gives the family court wide discretion and authority to allocate responsibility for the payment of attorney's fees and costs and take into consideration the respective merits of the parties.

was brought to the attention of the court or agency," as required under HRAP Rule 28(b)(4).

Although we may notice plain error under HRAP rule 28(b)(4), a party "has no right to cast upon the court the burden of searching through a voluminous record to find the ground of an objection."  Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 322 n.7, 713 P.2d 943, 950 n.7 (1986).  Crofford's cursory treatment of the points of error pertaining to the FOFs/COLs cannot reasonably be considered compliant with HRAP Rule 28(b)(4).  See Omerod v. Heirs of Kaheananui, 116 Hawaiʻi 239, 262, 172 P.3d 983, 1006 (2007).

We further note that Crofford's remaining sections in his brief fail to provide the necessary information to address his points of error pertaining to the family court's FOFs/COLs. While Crofford offers argument challenging various aspects of the family court's valuation of certain real and personal property, debts, and premarital contributions, he fails to specifically address the findings of fact and conclusions of law that he lists in his points of error in his arguments.  We are left to speculate which finding or conclusion Crofford seeks to address in his arguments, which we decline to do.  Based on the foregoing, the alleged points of error regarding the family court's FOFs/COLs are deemed waived.  See id. at 263, 172 P.3d at 1007; see also HRAP Rule 28(b)(7) ("[p]oints not argued may be deemed waived.").

## IV.  Conclusion

Based on the foregoing, we vacate the property division awards set forth in the Divorce Decree, entered on April 26, 2016, and the Findings of Fact and Conclusions of Law, entered on August 1, 2016.  We affirm the Order Assessing Attorney's Fees.

This case is remanded to the Family Court of the First Circuit for further proceedings consistent with this opinion.  On remand, the family court shall enter a new property division

award according to the parties' agreement set forth in the Marital Agreement and Addendum.

DATED:  Honolulu, Hawaiʻi, December 30, 2020.

| | |
|---|---|
| On the briefs: | /s/ Lisa M. Ginoza<br>Chief Judge |
| Rebecca A. Copeland,<br>for Defendant-Appellant/<br>Cross-Appellee. | /s/ Keith K. Hiraoka<br>Associate Judge |
| Michael A. Glenn,<br>for Plaintiff-Appellee/<br>Cross-Appellant. | /s/ Karen T. Nakasone<br>Associate Judge |